**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANE W, in her individual capacity, and in her capacity as the personal representative of the estates of her relatives, James W, Julie W, and Jen W;<br><br>JOHN X, in his individual capacity, and in his capacity as the personal representative of the estates of his relatives, Jane X, Julie X, James X, and Joseph X;<br><br>JOHN Y, in his individual capacity;<br><br>AND JOHN Z, in his individual capacity,<br><br>                Plaintiffs,<br>   v.<br><br>MOSES W. THOMAS,<br><br>                Defendant. | Civil Action No. _____<br><br>JURY TRIAL REQUESTED |

## COMPLAINT

Plaintiffs Jane W, John X, John Y, and John Z in their personal capacities and on behalf of their decedent relatives (collectively "**Plaintiffs**"), complain and allege as follows.

### PRELIMINARY STATEMENT

1.      This case arises from the brutal massacre of unarmed civilians seeking shelter in St. Peter's Lutheran Church (the "**Lutheran Church**" or the "**Church**") in Monrovia, Liberia (the "**Lutheran Church Massacre**" or the "**Massacre**").  The Church was a designated Red Cross humanitarian aid center sheltering civilians displaced from the growing violence in Liberia's countryside and in the capital city of Monrovia.  The Lutheran Church Massacre was one of the largest attacks on civilians during Liberia's two back-to-back civil wars, the first of

which was a seven-year armed conflict beginning in 1989 that took the lives of over 200,000 individuals and displaced half the nation's population.

2.      Plaintiffs, citizens of Liberia, are direct survivors of the Lutheran Church Massacre.  On July 29, 1990, Defendant, then-Colonel Moses W. Thomas ("**Thomas**"), was the head of a specialized branch of the Government's Armed Forces of Liberia ("**AFL**").   At Thomas's command, these armed forces surrounded the Lutheran Church and, over the course of several hours, indiscriminately shot or hacked to death approximately 600 sleeping civilian men, women, and children taking refuge there.  The Lutheran Church Massacre was part of a larger campaign of violence against the Mano and Gio ethnic groups by the AFL.  Plaintiffs, who survived the Lutheran Church Massacre by hiding under piles of dead bodies, witnessed the slaughter of hundreds of civilians, including their own family members.

3.      To this day, no one has been held accountable in Liberia or in any jurisdiction for this attack.  By 2002, over a decade after the Massacre, Thomas had fled Liberia and entered the United States, applying for immigration status under a program meant to assist the victims of the very war crimes he perpetrated.  Thomas currently resides in Sharon Hill, Pennsylvania.

4.      Plaintiffs institute this action against Thomas seeking compensatory and punitive damages for torts in violation of international and domestic law, and seek damages for extrajudicial killing and attempted extrajudicial killing; torture; cruel, inhuman, degrading treatment or punishment; war crimes; and crimes against humanity.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Plaintiffs' claims of extrajudicial killing, attempted extrajudicial killing, and torture pursuant to 28 U.S.C. § 1331 because these claims arise under the Torture Victim Protection Act ("**TVPA**"), Pub. L. No. 102-256, 106 Stat. 73

106612680v.1

(1992) (codified at 28 U.S.C. § 1350 *note*), and under the Alien Tort Statute ("**ATS**"), 28 U.S.C. § 1350.

6.     This Court has jurisdiction over Plaintiffs' claims of cruel, inhuman, degrading treatment or punishment; war crimes; and crimes against humanity under the ATS, 28 U.S.C. § 1350.

7.     The United States District Court for the Eastern District of Pennsylvania is a proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) because Thomas is a resident of Sharon Hill, Pennsylvania, within the Eastern District of Pennsylvania.

## PARTIES

### DEFENDANT

8.     On information and belief, Defendant Thomas was born in Liberia on April 17, 1953.  He is a citizen of Liberia and immigrated to the United States in or around 2000.  He currently resides in or around Sharon Hill, Pennsylvania.  Thomas held the rank of Colonel in the AFL and led the Lutheran Church Massacre against the civilians taking refuge there, including Plaintiffs and their families.

### PLAINTIFFS

9.     All four Plaintiffs seek to proceed under a pseudonym because they fear violent reprisals against themselves or surviving family members as a result of their participation in this lawsuit.  Plaintiffs are Liberian citizens who survived the Lutheran Church Massacre directed by Thomas.  Plaintiffs bring the claims detailed herein in their individual capacity and/or on behalf of family members murdered in the Massacre.  In particular:  Plaintiff **Jane W** is a Liberian citizen of the Gio tribe and resides in Liberia.  Jane W's husband, James W, and her two youngest daughters, Julie W (age 16) and Jen W (age 14) (collectively, "**Jane W's Decedents**"), and Jane W's aunt were all killed in the Massacre.  Plaintiff **John X** is a Liberian citizen of the

3

Gio tribe and resides in Liberia. John X's wife, Jane X (age 23), and daughter, Julie X (age 5), and his two brothers, James X (age 40) and Joseph X (age 37), (collectively, "**John X's Decedents**") were all killed in the Massacre. Plaintiff **John Y** is a Liberian citizen of the Mano tribe and resides in Liberia. Plaintiff **John Z** is a Liberian citizen of the Mandingo tribe and resides in Liberia.

## STATEMENT OF FACTS

10.     Except with respect to facts pertaining to Plaintiffs' backgrounds and matters falling within their personal knowledge, on information and belief Plaintiffs allege as follows:

### OVERVIEW OF THE LIBERIAN CIVIL WAR

11.     Liberia has experienced two civil wars, which together lasted 14 years (the "**First Civil War**" from 1989 to 1997, and the "**Second Civil War**" from 1999 to 2003). The civil wars emerged out of long-standing ethnic tensions that were brought to a head by a coup that took place in 1980 led by a Master Sergeant in the Liberian military, Samuel Doe ("**Doe**"). Since Liberia's colonization in 1822 by American emigrants, the country had reserved political power and legal rights solely for the descendants of the American settlers, known as "Americo-Liberians," who monopolized the government in Liberia for over a century, subjugating indigenous ethnic groups. Doe, a member of the indigenous Krahn tribe, together with then-Sergeant Thomas Quiwonkpa ("**Quiwonkpa**"), from the indigenous Gio tribe, replaced the "Americo-Liberian" government with a military junta, after assassinating then-President Tolbert and thirteen members of Tolbert's cabinet.

12.     As a result of the 1980 coup, Doe was named head of state and head of the military junta that declared control over Liberia. Doe used his position to promote members of his family clans within the Krahn tribe to the most important government and military positions.

Under Doe, the Krahn, who comprised only five percent of Liberia's population, held 33 percent of all government jobs, two-thirds of the senior positions, and all senior military positions.

13.     In 1985, Doe organized and won an election, which was widely viewed as a fraudulent effort to legitimize Doe's power.  Doe was declared the winner by a narrow margin over popular candidate Jackson F. Doe, who many believed to be the rightful winner.  Jackson Doe was a senior senator from the Gio ethnic group and native of Nimba County, a province in northeastern Liberia— just like Doe's ally in the 1980 coup, Quiwonkpa.  Quiwonkpa, formerly the Commanding General of the AFL, supported Jackson Doe and organized an attempt to overthrow Samuel Doe after the election.  Doe in return brutally quashed the rebellion and sent the military to retaliate against Manos and Gios in Nimba County, killing approximately 1,500 civilians.

14.     The First Civil War began in 1989 when Charles Taylor ("**Taylor**"), an Americo-Liberian and former government official in Doe's administration, joined forces with former Quiwonkpa supporters and assembled a group of approximately 150 rebel fighters in the Ivory Coast.  Taylor's forces (the National Patriotic Front of Liberia, or "**NPFL**") invaded a military outpost of Doe's AFL forces in Nimba County on December 24, 1989.  Following this invasion, Liberia was plunged into a brutal armed conflict for the next seven years.  Approximately 200,000 civilians were killed, 750,000 fled the country, and 1.2 million people were internally displaced.  The First Civil War ended with elections in 1997, which brought Taylor to the presidency, but violence continued to flare up regularly over the next two years.

15.     The Second Liberian Civil War began in 1999, when various opposition groups to Taylor's regime organized and invaded Liberia from Guinea.  Violence broke out across the country as Taylor's opposition gained control of the countryside and advanced towards the

106612680v.1

capital, Monrovia.  Before the opposition could occupy Monrovia, President Taylor resigned and the Accra Comprehensive Peace Agreement was negotiated and signed on August 18, 2003, ending the war.  The country instituted a transitional government from 2003 until the first democratic election, in November 2005, when Ellen Johnson Sirleaf ("**Sirleaf**") was elected.

### SATU's And EMG's Systematic Attacks On Mano And Gio Civilians

16.     Thomas began serving in the AFL under Doe's regime in or before 1985.  By around 1986, Thomas had received specialized military training in Israel on counterterrorism tactics, as well as training in hand-to-hand combat and the use of small weapons, and was made the deputy commander of a unit within the Executive Mansion Guard Battalion ("**EMG**") of the AFL called the Special Anti-Terrorist Unit ("**SATU**").  SATU was a highly-trained, elite special forces unit established by Doe after the 1985 election to serve as the President's personal guard.  The SATU reported directly to Doe.  Both the EMG and its SATU sub-unit were commanded by and largely composed of Krahns, Doe's tribal group.  Thomas served as deputy commander and, by 1990, had been made commander of the SATU forces.

17.     Under the pretense of "hunting rebels," the SATU—along with other AFL units— targeted Mano and Gio civilians, including women and children, based exclusively on their ethnic origin.  The EMG and SATU were involved in the brutal response to Quiwonkpa's 1985 attempted coup in Nimba County, where they killed Mano and Gio civilians indiscriminately.  When Taylor's forces crossed into Liberia in 1989, the EMG and SATU were again sent to Nimba County to crush the rebellion—a goal they pursued by indiscriminately killing unarmed civilians, raping, burning villages, and looting.  In the first month, hundreds of civilians, mostly from the Mano and Gio tribes, were killed by the military.  Over 160,000 civilians fled, some to the Ivory Coast and Guinea and others to Monrovia, which was still untouched by the conflict.

106612680v.1

Taylor began recruiting Manos and Gios to his forces, many of whom joined to seek revenge against Doe.

18.     As Taylor's forces advanced toward Monrovia, soldiers from the EMG and SATU stationed at the Executive Mansion began carrying out attacks against Mano and Gio civilians within the city, ostensibly to quash a potential rebellion and prevent more people from joining the insurgent forces.  Hundreds of people were pulled from their homes by government soldiers at night and shot to death or decapitated on the streets.  Others were taken to detention centers inside military barracks such as the Executive Mansion and the Barclay Training Center.

19.     Manos and Gios inside the capital city, some of whom had just arrived in flight from Nimba County and others who had made their lives there, fled their homes out of fear of being targeted by Doe's forces.  People made their way to camps and shelters set up for internally displaced persons (known in international legal terms as "**IDPs**", which defines persons who have been forced to flee their homes but remain within their state's borders) by the Red Cross and the Liberian Council of Churches; including the United Nations Development Program Compound (the "**UNDP Compound**"), J.J. Roberts School, John F. Kennedy Hospital, and the Lutheran Church.  Each civilian center provided food and some medical care for residents.  Each was marked with Red Cross flags.

20.     On May 30, 1990, government soldiers attacked the UNDP Compound, which was sheltering mostly Mano and Gio civilians. The soldiers entered the compound, shot indiscriminately into the crowd, and abducted about 40 civilians, many of whom were found dead the next day.  As a result, thousands of additional people, mostly Manos and Gios, fled to local churches, including the Lutheran Church, for safety. Near the end of June 1990, Thomas led an operation with SATU and EMG soldiers to identify possible rebel activity at a residential

compound.  The soldiers entered at night, arrested the residents of the building—all Mano or Gio men, women and children—and took them to the Executive Mansion grounds.  Soldiers under Thomas's command looted the residential compound and raped some of the captured women. After brutal interrogations at the Executive Mansion grounds, soldiers from the SATU unit, which was under Thomas's command, executed all the prisoners.

21.     In June 1990, the AFL began purging the military of Manos and Gios.  AFL forces imprisoned at least 200 of the AFL's own Mano and Gio soldiers in the Post Stockade Prison, located within the Barclay Training Center Military Barracks. Twenty-five of the imprisoned soldiers escaped and sought refuge in the Methodist church in an eastern Monrovia neighborhood known as Sinkor. The remaining Gio and Mano soldiers in the prison were executed. John X's brothers, who were members of the military police and were ethnic Gio, defected from the military as a result of the purges, laid down their arms, and fled to St. Peter's Lutheran Church.

22.     As Taylor's forces drew nearer to Monrovia, the AFL intensified its targeting of Mano and Gio civilians.  On July 25, 1990, a group of AFL soldiers entered the John F. Kennedy Hospital in Monrovia, which was being used as a shelter for many Gios.  The soldiers rounded up 250 civilians who worked at or were seeking refuge in the hospital and executed them at the James Spriggs-Payne Airfield.  Many of the survivors of this attack, including John Y and his family, fled from the hospital and sought refuge at the Lutheran Church.

### AWARENESS OF THE LUTHERAN CHURCH AS A CIVILIAN SHELTER

23.     Following the AFL's attack on the UNDP Compound on May 30, 1990, the Liberian Council of Churches and the Red Cross established humanitarian aid centers at the Lutheran Church and a nearby Methodist church for the nearly 9,000 civilians in the city.  The Lutheran Church refuge was run by the Lutheran Church of Liberia ("**LCL**"), a member of the

8

Liberian Council of Churches.  By June 4, 1990, more than 2,000 civilians were seeking refuge at the Lutheran Church alone.

24.     At the time, the Church compound consisted of a main church building abutted by a school building, forming a rough "L" shape.  A chest-high solid fence surrounded the compound, which allowed a view onto the street to anyone taller than around five feet.  Red Cross banners were placed on the four corners of the compound and at the entrance of the Church, clearly marking the location as a humanitarian aid center.  Red Cross workers and church volunteers distributed food and medicine daily to the roughly 2,000 residents.  The Church continued to conduct regular communion and prayer services, and had a school for young children.  As of early June 1990, men were mainly housed in the Church building, while women and children slept in the school building, though some families chose to stay together in the main Church building.  The Church compound was patrolled by unarmed volunteers, and none of the civilians or Church or humanitarian aid staff was armed.

25.     During this time, Doe established a citywide curfew from 6:00 p.m. to 6:00 a.m.  Government forces were permitted to shoot anyone found outside after curfew, on the assumption that anyone breaking curfew was a rebel.  Refugees seeking shelter at the Church were thus required to remain inside the crowded Church compound for twelve hours a day.  Even outside of the curfew, most civilians, particularly Manos and Gios, were prevented from moving about Monrovia by numerous AFL checkpoints.  At these checkpoints, soldiers would identify Manos and Gios, often by language, dialect, or accent, sometimes shooting the person on the spot.

26.     Thomas was aware that the Church was a shelter for civilians.  In the days before the Lutheran Church Massacre on July 29, 1990, government military vehicles drove past the

Church frequently.  On at least one of these occasions, Thomas himself, accompanied by a small group of soldiers under his command, stopped at the Church.  When the soldiers arrived, the Church compound was filled with women and their young children, preparing food and washing clothing in the front yard.  Thomas addressed the people directly, telling them to remain at the Church and promising that he would guard them and ensure their safety.

### THE LUTHERAN CHURCH MASSACRE

27.    At the time of the Lutheran Church Massacre, Thomas served as commander of the SATU and reported directly to both President Doe and the head of the EMG Battalion.  On or before July 29, 1990, Thomas instructed approximately 45 soldiers from the SATU and EMG under his direct command that their mission was to kill all the people in the Lutheran Church compound regardless of whether or not they were rebels.

28.    The violence began in the afternoon of July 29, 1990, two blocks from the Lutheran Church at the Lutheran Bishop's Compound.  An additional 300 civilians, including a U.S. missionary working for the Bishop, had taken shelter in the Lutheran Bishop's Compound, which also held provisions designated for distribution to the displaced persons living at the Lutheran Church and the Methodist church.  At the time of the attack, the Bishop had been working with the Liberian Council of Churches to mediate peace negotiations. The soldiers looted the provisions, and then proceeded to arrest the Compound's residents, including a Lutheran pastor, the former Commissioner of Police, and the Commissioner of Police's wife, who was a relative of the Bishop.  Although the pastor was later released, the Commissioner of Police and his wife were never seen again.  In addition, the soldiers shot and killed the adopted daughter of the U.S. missionary and took possession of her body, preventing the missionary from burying her loved one.

10

29.     That same night, while most of the 2,000 men, women and children inside the Church and adjoining school building were asleep, Thomas and approximately 45 SATU and EMG soldiers under his command entered the Church compound and opened fire on the unarmed residents with small arms, including assault rifles.  Some soldiers also carried "cutlasses" or machetes.

30.     Countless people were felled by bullets, until the bodies piled up on the floor.  A few of the residents, including Plaintiffs, survived by hiding under piles of dead bodies and feigning death as soldiers stabbed fallen victims to ensure that they were truly dead.  Some women were raped before they were murdered.  Soldiers looted the belongings of those they killed.  Following the shooting, soldiers used cutlasses to hack many of the injured or hiding survivors to death.

31.     Jane W, her husband James W, and their two youngest daughters, Julie W and Jen W, as well as Jane W's elderly aunt were asleep inside the main church building when they were awakened by gun shots being fired into the crowd of sleeping residents by soldiers in green uniforms and combat helmets.  Within moments, Jane W's daughter, Julie W, and Jane W's elderly aunt were shot and killed as Jane W watched in horror.  James W gathered their other daughter, Jen W, and ran toward the doors of the Church in an attempt to escape.  Jane W lost sight of them, but later discovered that they had both been shot and killed.  Jane W survived by hiding under piles of dead bodies until the shooting ended.

32.     John X and his two brothers were also sleeping in the main church building at the Lutheran Church, while his wife and young daughter were sleeping in the adjacent school building.  John X awoke to the sound of soldiers firing weapons into the crowd of people

11

sleeping in the church. John X survived the assault by hiding among the dead bodies until the morning, but his wife, daughter, and two brothers all were murdered.

33.     John Y was sitting by the pulpit in the back of the Lutheran Church when he heard someone shout that he was going to kill all the rebels.  Soldiers then stormed the Church and began shooting at the crowd, many of whom were asleep in bed.  John Y hid inside the church pulpit to escape the assault, but was shot in the leg.

34.     John Z was one of a number of refugees sleeping outside the school building at the Lutheran Church, within the border fence of the Church compound.  He awoke to see soldiers in SATU uniforms and combat helmets enter the Church compound and begin shooting the people sleeping outside the buildings.  John Z hid among the dead bodies piled around him and pretended to be dead.  During the course of the attack, a soldier stabbed a cutlass into the pile of bodies John Z was hiding in, stabbing John Z in the arm.  Near the end of the attack, John Z saw Thomas standing in the front courtyard of the Church, carrying a pistol.  John Z heard Thomas issue a ceasefire order, ending the assault.

35.     The attack carried out under Thomas's command lasted several hours.  After Thomas issued the order to cease firing, the soldiers stopped the attack and loaded into military vehicles to return to their stations.  The soldiers left behind them approximately 600 dead civilians and hundreds more wounded civilians.

36.     The violence continued against the survivors of the attack the next morning.  Red Cross workers and church volunteers carried wounded survivors to the nearby John F. Kennedy Hospital and Catholic hospital.  Many of the survivors, including Plaintiff John X, fled to a nearby refugee center at the J.J. Roberts School.  That afternoon, Thomas went to the gates of the J.J. Roberts School and accused the Red Cross of hiding rebels.  Later that day, AFL soldiers

entered the school premises, where John X remained sheltered.  The soldiers announced their intention to kill all Manos and Gios before the rebels reached Monrovia and then proceeded to execute civilians, including a Red Cross worker, with guns and machetes.

37.    Relief workers took John Y to a nearby hospital for treatment the next morning. He saw the dead bodies of his aunt and her small baby before he left the Church.  His mother and younger brother fled to Don Boscoe School, another civilian shelter, for protection.  A week later John Y located his father, and they both walked for over a month to Nimba County.  The family was finally reunited after two more years, when John Y's mother and younger brother were at last able to make their way to Nimba County.

38.    The morning after the Lutheran Church Massacre, Jane W fled with dozens of other survivors to Mount Barclay Camp, an IDP center on the outskirts of Monrovia. She then spent over a month walking over 300 kilometers back to Nimba County, where she stayed for the remainder of the war.  A year later, she was reunited with her eldest daughter, who had been at a different shelter on the night of the Lutheran Church Massacre.

39.    Many survivors of the Lutheran Church Massacre also fled to a nearby United States Agency for International Development ("**USAID**") compound, but AFL soldiers broke into the compound that afternoon to arrest several hundred survivors.   The AFL soldiers executed the survivors at a nearby beach.

40.    The bodies of the civilians slaughtered at the Lutheran Church remained where they had fallen for months until October 1990, when a group of volunteers buried the bodies in mass graves on the Church grounds.

### ONGOING IMPUNITY

41.    In the days following the Lutheran Church Massacre, the U.S. Embassy and several international organizations condemned the Liberian government.   No one was held

accountable for the attacks.  Back-to-back civil wars raged for the next thirteen years in Liberia until the Comprehensive Peace Agreement of 2003.  The agreement itself was tentative and overshadowed by a continued threat of reoccurring violence.  Liberia remained under a transitional government until Sirleaf's inauguration in January 2006.

42.     On May 12, 2005, the transitional government enacted a law establishing a Truth and Reconciliation Commission ("**TRC**") for Liberia, with a broad mandate to investigate gross human rights violations committed from January 1979 to October 2003, and to identify perpetrators responsible for these abuses. The TRC was tasked with recommending individuals for investigation and prosecution for the crimes detailed in the mandate and had the power to recommend amnesty for some individuals, in limited circumstances.  In addition, the TRC was empowered to make recommendations to the Head of State regarding reparation and rehabilitation of victims of wartime atrocities and human rights abuses.

43.     The TRC was tasked with making recommendations to the Government of Liberia on the problem of impunity for alleged perpetrators and on reparations for victims.  The TRC did not require individual victims to raise claims, but rather had a broad-scale mandate to investigate wartime atrocity crimes and human rights abuses, including "massacres, sexual violations, murder [and] extra-judicial killings."  Plaintiffs had reason to believe that the TRC would investigate, and was in fact investigating, the human rights violations committed during the Lutheran Church Massacre.

44.     The TRC issued its final report and recommendations on July 1, 2009 to President Sirleaf. Among other measures, the TRC recommended the creation of an Extraordinary Chamber within the Courts of Liberia to prosecute war crimes and crimes against humanity, including the crimes that took place during the violent attack of the Lutheran Church.  In January

2011, the Liberian Supreme Court determined that the TRC's recommendations were merely "an option" for the government to implement or ignore at its discretion. As of the time of filing, no laws have been passed to establish a special court for wartime atrocities in Liberia, and no prosecutions have occurred.

45.     In spite of the Comprehensive Peace Agreement of 2003, which envisioned prosecution of wartime atrocities and reparations for victims, impunity has persisted in Liberia. As of the date of the filing of this Complaint, several of the most renowned alleged perpetrators of war crimes and serious abuses still hold political office.

46.     Even after the start of nominal peace in 2003 and the election of Sirleaf in 2005, violence continued in some parts of the country. Witnesses who have come forward to testify against individual perpetrators, even perpetrators residing outside of Liberia, have been threatened as a result.

47.     In addition to persistent impunity, efforts to investigate the Lutheran Church attack and other atrocities were also delayed by the Ebola pandemic that struck Liberia and neighboring countries. West Africa was gripped by the pandemic from March 30, 2014 until June 9, 2016. During that time, travel in and around Liberia was extremely dangerous and rendered nearly impossible by government decree.

48.     Liberia's prolonged, back-to-back civil wars resulted in a lack of civil and legal infrastructure, including underdeveloped transportation infrastructure, limited access to technology, and a judiciary without capacity to investigate or resolve individual claims arising from the civil wars. These problems persisted during and after the civil wars and continue to this day. Consequently, Plaintiffs and other victims of human rights violations had no way to independently investigate claims for those violations.

106612680v.1

49.     In or around August 2000, Thomas emigrated to the United States and actively took steps to conceal his connection to his crimes in Liberia, including by applying for immigration status under a program meant to assist the victims of the very war crimes he perpetrated.  Plaintiffs had no way to discover that Thomas was in the United States, and only John Y was aware of Thomas's identity.

### Legal Framework

50.     The ATS permits non-citizens to bring suit in U.S. courts for violations of the law of nations or a treaty of the United States when those claims "touch and concern the territory of the United States."  *Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 124– 25 (2013).  The ATS confers jurisdiction on this Court because Plaintiffs' claims for violations of the law of nations profoundly impact the United States.

51.     Thomas has continuously resided in the United States for approximately seventeen years, escaping both criminal and civil liability for the atrocities he committed in Liberia.   The United States has publicly affirmed its commitment to ending impunity for perpetrators of gross human rights violations and has an interest in ensuring that it does not provide safe harbor to Thomas from claims, like Plaintiffs', seeking redress for egregious violations of the law of nations.  Moreover, Thomas sought to remain in the United States under an immigration policy intended to assist victims of the conflict, including victims of the atrocities committed by Thomas alleged herein.

52.     The violent rampage that gives rise to Plaintiffs' claims also harmed U.S. citizens, a U.S. agency, and a U.S.-affiliated religious institution, and took place in the broader context of a civil war in which the United States was deeply involved owing to its long-standing historical ties with Liberia.  When government soldiers broke into the Lutheran Bishop's Compound the day of the Lutheran Church Massacre, they threatened a U.S. missionary with serious bodily

16

injury, murdered her adopted daughter, and took possession of the daughter's body.   The following day, AFL soldiers pursued survivors of the Lutheran Church Massacre who had fled to the compound of a U.S. agency—USAID—and invaded the compound to continue their violent rampage.   The soldiers arrested hundreds of survivors and executed them at a nearby beach.   Ten days later, government soldiers again entered the USAID compound to arrest and imprison a U.S. citizen who had provided first aid to the survivors fleeing the Massacre. On August 17, 1990, SATU forces also captured, beat, and shot another U.S. missionary in Monrovia.   The missionary died while in custody at the Executive Mansion.   The Lutheran Church itself was also closely affiliated with a U.S. institution—the refuge at the Lutheran Church was run by the LCL, over which the Evangelical Lutheran Church of America exercised formal stewardship until 1965, and to which it gave extensive operational and administrative support until 1992 (including during the period Thomas committed the atrocities alleged herein).

53.     Indeed, the LCL was a specific target of Doe's military forces for the role that it played, in conjunction with the United States Government, in seeking to broker a peace agreement to end the violence of his regime.   Historically, the United States—which always had a unique relationship with Liberia owing to its role in founding Liberia—had supported Doe's administration.   In 1985, before the First Civil War began, the United States intervened in favor of Doe's administration, declaring his election legitimate, deploying soldiers in Monrovia, and warning him of a coup.   The United States subsequently provided half a billion dollars in aid to Doe's administration and invested heavily in Liberia's military infrastructure, establishing a strategic military base, CIA station, and airfield for U.S. use during the Cold War.

54.     However, beginning in 1988, Doe's administration became increasingly antagonistic towards U.S. interests.   In late 1988, Doe expelled U.S. advisors from his

government, threatening their safety.  By June 3, 1990, U.S. warships were stationed off the coast of Liberia, in preparation for a possible intervention.  On June 5, 1990, the Inter-Faith Mediation Committee (the "**IFMC**")—headed by the LCL's Bishop Ronald Diggs—met with Doe and demanded his resignation.  One week later, on June 12, 1990, the IFMC held a meeting at the U.S. Embassy to attempt to broker a peace agreement that involved Doe's resignation.

55.     Thereafter, Doe's military forces targeted the IFMC, Diggs, and the LCL leadership generally.  It was against this backdrop that the attack on Bishop Diggs' Compound, during which AFL forces threatened a U.S. missionary and murdered her daughter, occurred mere hours before the Lutheran Church Massacre.  Although the United States decided not to intervene militarily in the wake of the Massacre and the subsequent invasion of the USAID base, the Massacre marked a turning point:  within a week, the United States had launched a mission to evacuate U.S. citizens, most U.S. government personnel and others from the war-torn capital.

56.     The United States ultimately played a critical role in resolving the First Civil War. Following the Lutheran Church Massacre, the U.S. Embassy made multiple attempts to institute a ceasefire.  The U.S. government played a key role in negotiating the Comprehensive Peace Agreement that officially ended the civil war, sent troops to Liberia in order to rescue thousands of people, and accepted between 20,000 to 30,000 refugees into U.S. territory.  The U.S. Embassy was the only embassy to remain open for the duration of the conflict.  After the conflict ended, TRC hearings with victims and perpetrators were held in the United States.

**FIRST CLAIM FOR RELIEF**

**ALIEN TORT STATUTE AND TORTURE VICTIM PROTECTION ACT:
EXTRAJUDICIAL KILLING *(BY PLAINTIFFS JANE W AND JOHN X IN
THEIR INDIVIDUAL CAPACITIES, AND AS REPRESENTATIVES OF
THEIR DECEDENT ESTATES)***

57.     Plaintiffs Jane W and John X, in their individual capacities, and as representatives of the estates of Jane W's Decedents and John X's Decedents, re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

58.     During the Lutheran Church Massacre on July 29, 1990, James W (Jane W's husband), Julie and Jen W (Jane W's two daughters), Jane X (John X's wife), Julie X (John X's daughter), James and Joseph X (John X's two brothers) were all killed by members of the AFL.

59.     The killings of Jane W's and John X's family members constitute extrajudicial killings in violation of the TVPA, 28 U.S.C. § 1350 *note*, § 2(a).  In addition, the killings constitute "tort[s] … committed in violation of the law of nations or a treaty of the United States" under the ATS, 28 U.S.C. § 1350, in that these acts were committed in violation of customary international law prohibiting extrajudicial killings as widely expressed, clearly defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

60.     Thomas's acts described herein and the acts committed by the soldiers under his direction and control were committed under actual or apparent authority, or color of law, of the Republic of Liberia and the AFL during the administration of President Doe.

61.     The killings of Plaintiffs' family members were not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees that are recognized as indispensable by civilized peoples.  The killings were not, under international law, lawfully carried out under the authority of Liberia or any other foreign nation.  Plaintiffs'

family members were never charged with, convicted of, or sentenced for any crime.  Plaintiffs and their family members were unarmed and did not pose a real or apparent threat to persons or property that would have justified the use of deadly force against them.

62.     The acts alleged were committed by Thomas or individuals under his command, over whom he possessed the legal authority and practical ability to exert control by virtue of being a commander in the AFL, as described in paragraphs 16, 27, and 35.  During the Lutheran Church Massacre, Thomas was the military commander or acting military commander for both the SATU and EMG forces committing the joint operation as described in paragraphs 27 to 40. Thomas thus knew or reasonably should have known about the abuses committed against Plaintiffs and their decedents by virtue of his participation in the Lutheran Church massacre.

63.     As a member of the AFL and commander of SATU, Thomas had a duty under customary international law, multilateral treaties, and Liberian law to ensure the protection of civilians, to prevent violations of international and Liberian law by soldiers under his command, and to ensure that all persons under his command were trained in and complied with international and Liberian law, including the prohibitions against extrajudicial killing, war crimes, and crimes against humanity.

64.     Thomas was under a duty to investigate, prevent and punish violations of international and Liberian law committed by soldiers under his command.  Thomas failed or refused to take all necessary measures to investigate and prevent the abuses described herein, or to punish personnel under his command for committing such abuses, making him also liable under a theory command responsibility.

65.     Thomas ordered, incited, and/or solicited SATU and EMG forces to commit the attacks on people taking refuge in the Lutheran Church, as described in paragraphs 27 to 40.   As

an officer in the AFL and commander of SATU, Thomas exercised authority during the Lutheran Church massacre, instructing SATU and EMG forces during the attack, and soliciting their participation. Thomas's incitement and/or solicitation was directed to, and likely to produce, imminent unlawful action. Thomas was aware of the substantial likelihood of harm in ordering, inciting, or soliciting the attack at the Lutheran Church, and consciously desired that the unlawful attacks be executed. Thomas's ordering, incitement, and solicitation had a direct and substantial effect on the commission of the wrongful acts.

66.    Thomas conspired and knowingly acted in concert with one or more members of the AFL, pursuant to a common plan, design, or scheme to use physical violence and intimidation, in furtherance of the wrongful acts alleged herein, as described in paragraphs 27 to 40. Thomas knowingly joined and participated in carrying out this common plan, design, and scheme. In addition to being personally liable for his own actions, Thomas is jointly and severally liable for the actions of his co-conspirators, all of which were actions undertaken in furtherance of a common plan, design, and scheme to carry out the Lutheran Church Massacre.

67.    Thomas also co-perpetrated and engaged in a joint criminal enterprise with SATU and EMG forces that planned or carried out the attack at the Lutheran Church on July 29, 1990, the common purpose of which was to attack the Lutheran Church and to eliminate civilians perceived as sympathetic to insurgent groups. In execution of this common plan, Thomas and his co-perpetrators committed the extrajudicial killings and other violations of international law against Plaintiffs and their family members detailed herein. Thomas and his co-participants in the attack were aware of and intended the substantial likelihood of harm to civilians including Plaintiffs and their family members that resulted from the attack.

68.     Taking into account Thomas's command position, presence during the attack, and efforts to organize the attack, Thomas provided an essential contribution to the common plan, which resulted in the commission of the violations of international law detailed herein.

69.     In addition, Thomas aided, abetted, or otherwise substantially assisted in the commission or attempted commission of the unlawful acts alleged herein as described in paragraphs 27 to 40, which had a substantial effect on the commission of those acts.   At all relevant times, Thomas knew that his actions would aid, abet or assist in the commission of the wrongful conduct alleged herein.   Thomas is therefore jointly and severally liable for the wrongful conduct of the persons whom he aided and abetted.

### SECOND CLAIM FOR RELIEF

#### ALIEN TORT STATUTE AND TORTURE VICTIM PROTECTION ACT: ATTEMPTED EXTRAJUDICIAL KILLING
#### (BY ALL PLAINTIFFS IN THEIR INDIVIDUAL CAPACITIES)

70.     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

71.     During the attack at the Lutheran Church, Plaintiffs were shot at and stabbed by members of the SATU and EMG forces acting under direct orders, direction, and instigation from Thomas.   All Plaintiffs were placed in imminent danger to their lives.   Plaintiff John Y additionally suffered a bullet wound in the leg, while Plaintiff John Z was stabbed in the arm.

72.     The acts taken against Plaintiffs during the Lutheran Church Massacre constitute attempted extrajudicial killings in violation of the TVPA, 28 U.S.C. § 1350 *note*, § 2(a). In addition, the attempted extrajudicial killings constitute "tort[s] … committed in violation of the law of nations or a treaty of the United States" under the ATS, 28 U.S.C. § 1350, in that these acts were committed in violation of customary international law prohibiting attempted extrajudicial killings as widely expressed, clearly defined, and codified in multilateral treaties

22

and other international instruments, international and domestic judicial decisions, and other authorities.

73.    Thomas's acts described herein and the acts committed by the soldiers under his direction and control were committed under actual or apparent authority, or color of law, of the Republic of Liberia and the AFL during the administration of President Doe.

74.    The attempted killings of Plaintiffs were not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees that are recognized as indispensable by civilized peoples.   The attempted killings were not, under international law, lawfully carried out under the authority of Liberia or any other foreign nation. Plaintiffs were never charged with, convicted of, or sentenced for any crime.   Plaintiffs were unarmed and did not pose a real or apparent threat to persons or property that would have justified the use of deadly force against them.

75.    As pleaded in paragraphs 62 to 69, with respect to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of attempted extrajudicial killing set forth in paragraphs 70 to 74 above.

### THIRD CLAIM FOR RELIEF

**TORTURE VICTIM PROTECTION ACT AND ALIEN TORT STATUTE:
TORTURE(*BY ALL PLAINTIFFS IN THEIR INDIVIDUAL CAPACITIES,
AND AS REPRESENTATIVES OF THEIR DECEDENT ESTATES*)**

76.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

77.    On July 29, 1990, Thomas and the SATU and EMG forces trapped Plaintiffs in St. Peter's Lutheran Church along with hundreds of other civilians.   The SATU and EMG forces

fired repeatedly into the crowd, and then moved through the Church stabbing bodies to eliminate survivors, and in some cases committing sexual violence.  These actions placed Plaintiffs in imminent fear of death or severe pain and suffering to themselves and to their family members. Plaintiffs were forced to hide under fallen bodies or in cramped spaces in order to survive. As a result of these actions, Plaintiffs suffered physical injury, including gunshot and stab wounds, and intense mental suffering, witnessing the deaths of their family members and other people trapped in the Lutheran Church.  The acts perpetrated against Plaintiffs constitute torture in violation of the TVPA, 28 U.S.C. § 1350, *note*.  In addition, these acts constitute "tort[s] . . . committed in violation of the law of nations or a Treaty of the United States" under the ATS, 28 U.S.C. § 1350, in that these acts were committed in violation of customary international law, as expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

78.    At the time these acts occurred, Thomas and soldiers under his command had surrounded the Lutheran Church compound and executed individuals that tried to escape. Accordingly, Plaintiffs and their decedents were in the custody or physical control of Thomas and his subordinates.

79.    The acts described herein were inflicted deliberately and intentionally for purposes that include punishing Plaintiffs and other civilians for acts that they or third persons were suspected of having committed, intimidating or coercing Plaintiffs and other civilians, and/or discriminating against Plaintiffs on the basis of their alleged political beliefs or ethnicity.

80.    Thomas's acts described herein and the acts committed by the soldiers under his direction and control were committed under actual or apparent authority, or color of law, of the Republic of Liberia and the AFL during the administration of President Doe.

81.     The torture of Plaintiffs and their decedents did not arise from and was not inherent in or incidental to lawful sanctions.  Plaintiffs and their decedents were never charged with, convicted of, or sentenced for any crime punishable by acts alleged herein.

82.     As pleaded in paragraphs 62 to 69, with regard to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of torture set forth in paragraphs 76 to 81 above.

## FOURTH CLAIM FOR RELIEF

### ALIEN TORT STATUTE:  CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT *(BY ALL PLAINTIFFS IN THEIR INDIVIDUAL CAPACITIES, AND AS REPRESENTATIVES OF THEIR DECEDENT ESTATES)*

83.     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

84.     Plaintiffs and decedents were subjected to acts meant to inflict mental and physical suffering, anguish, humiliation, fear, or debasement. Over the course of the Massacre, Plaintiffs and their decedents were shot at over a period of hours and Plaintiffs survived only by hiding among dead or fallen bodies.  Plaintiffs suffered physical injury, including gunshot and stab wounds, and severe mental suffering, including as the result of witnessing the deaths of their family members and other civilians.

85.     These acts constituted cruel, inhuman, or degrading treatment of punishment, and constitute "tort[s] . . . committed in violation of the laws of nations or a treaty of the United States" under the ATS, 28 U.S.C. § 1350.  The acts were in violation of customary international law prohibiting cruel, inhuman, or degrading treatment or punishment as reflected, expressed,

defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

86.     As pleaded in paragraphs 62 to 69, with respect to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of cruel, inhuman, or degrading treatment or punishment set forth in paragraphs 83 to 85 above.

## FIFTH, SIXTH, SEVENTH, EIGHTH, AND NINTH CLAIMS FOR RELIEF

### ALIEN TORT STATUTE:  WAR CRIMES

87.     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

### CONTEXTUAL ELEMENTS

88.     Thomas's acts against Plaintiffs and their decedents were committed in the context of, and associated with, an armed conflict as described paragraphs 11 to 22.

89.     The acts identified in Claims Five through Nine below were committed in the context of, and associated with this armed conflict, and constitute war crimes, and each one is therefore a "tort . . . committed in violation of the laws of nations or a treaty of the United States" under the ATS, 28 U.S.C. § 1350.  The acts were committed in violation of Common Article 3 of Geneva Conventions I-IV and customary international law prohibiting war crimes as reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

90.     Thomas and the SATU and EMG forces were aware of the factual circumstances that established the existence of an armed conflict, in part because they were active participants

in the armed conflict.  This armed conflict bound Thomas to follow the obligations of Common Article 3 of the Geneva Conventions of 1949 and the customary norms of internal armed conflict.

91.     At all relevant times described herein, the civilians inside the Lutheran Church, including Plaintiffs and their decedent family members, were unarmed civilians taking no active part in hostilities, and therefore were protected under Common Article 3 of the Geneva Conventions of 1949 and the customary norms of internal armed conflict.  Thomas and the SATU and EMG forces under his command knew that the civilians inside the Lutheran Church, including the Plaintiffs and their decedent family members, were unarmed civilians.  The Lutheran Church was a center for humanitarian relief marked with Red Cross flags on all four corners of the compound.

### FIFTH CLAIM FOR RELIEF: WAR CRIME OF TORTURE AND CRUEL TREATMENT (BY ALL PLAINTIFFS IN THEIR INDIVIDUAL CAPACITIES, AND AS REPRESENTATIVES OF THEIR DECEDENT ESTATES)

92.     As part of the internal armed conflict, Thomas and members of the SATU and EMG forces subjected Plaintiffs and their family members to torture and cruel treatment at St. Peter's Lutheran Church.  On July 29, 1990, Thomas and the SATU and EMG forces surrounded St. Peter's Lutheran Church.  SATU and EMG forces fired repeatedly into a crowd of unarmed IDPs and then moved throughout the compound, stabbing bodies to eliminate survivors. Plaintiffs either died under these conditions or were forced to hide under fallen bodies or in cramped spaces in order to survive.  As a result of these actions, Plaintiffs suffered physical injury, including gunshot and stab wounds, and witnessed the death of their family members and other civilians. These actions inflicted severe physical or mental pain or suffering upon Plaintiffs and their decedents.

93.     The acts described herein were inflicted deliberately and intentionally for purposes that include punishing Plaintiffs and other civilians for acts that they or third persons were suspected of having committed; intimidating or coercing Plaintiffs and other civilians; and/or discriminating against Plaintiffs and other civilians on the basis of their alleged political beliefs, ethnicity, or county of origin.

94.     As pleaded in paragraphs 62 to 69, with regard to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of the war crime of torture and cruel treatment set forth in paragraphs 87 to 93 above.

### SIXTH CLAIM FOR RELIEF: WAR CRIME OF INTENTIONALLY DIRECTING ATTACKS AGAINST THE CIVILIAN POPULATION AND CIVILIANS TAKING NO DIRECT PART IN HOSTILITIES *(BY ALL PLAINTIFFS IN THEIR INDIVIDUAL CAPACITIES, AND BY PLAINTIFFS JANE W AND JOHN X AS REPRESENTATIVES OF THEIR DECEDENT ESTATES)*

95.     Thomas and the SATU and EMG forces acting under his direction targeted the Lutheran Church, a designated Red Cross shelter providing humanitarian assistance to civilians during the armed conflict.  The nearly 2,000 civilians inside the shelter were unarmed civilians, taking no active part in the hostilities.

96.     Thomas directed the attack against unarmed civilians.  Thomas's actions in ordering the Lutheran Church Massacre therefore constitute the war crime of intentionally directing attacks against the civilian population and civilians not taking direct part in hostilities.

97.     As pleaded in paragraphs 62 to 69, with regard to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU

and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of the war crime of intentionally directing attacks against a civilian population and civilians taking no direct part in hostilities set forth in paragraphs 87 to 91 and 95 to 96 above.

### SEVENTH CLAIM FOR RELIEF: WAR CRIME OF MURDER
#### (BY PLAINTIFFS JANE W AND JOHN X IN THEIR INDIVIDUAL CAPACITIES, AND AS REPRESENTATIVES OF THEIR DECEDENT ESTATES)

98.     During the Lutheran Church Massacre on July 29, 1990, James W (Jane W's husband), Julie and Jen W (Jane W's two daughters), Jane X (John X's wife), Julie X (John X's daughter), James and Joseph X (John X's two brothers) were each killed by SATU and/or EMG soldiers acting under Thomas's direction.

99.     Both James and Joseph X (John X's brothers) had defected from the military police two months prior to the Lutheran Church Massacre, had laid down their weapons, and were taking no active part in the hostilities.  Jane W's relatives and John X's wife and daughter had never taken any part in the armed conflict and were civilians taking shelter at the Lutheran Church.

100.     The Lutheran Church Massacre, which resulted in the death of Plaintiffs' decedents, constitutes the war crime of murder because it occurred in the context of and was associated with an armed conflict not of an international character.

101.     As pleaded in paragraphs 62 to 69, with regard to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of the war crime of murder set forth in paragraphs 87 to 91 and 98 to 100 above.

106612680v.1

**EIGHTH CLAIM FOR RELIEF: WAR CRIME OF INTENTIONALLY
DIRECTING ATTACKS AGAINST PERSONNEL OR OBJECTS INVOLVED
IN HUMANITARIAN ASSISTANCE *(BY ALL PLAINTIFFS IN THEIR
INDIVIDUAL CAPACITIES, AND BY PLAINTIFFS JANE W AND
JOHN X AS REPRESENTATIVES OF THEIR DECEDENT ESTATES)***

102.    Thomas and the SATU and EMG forces acting under Thomas's direction targeted the Lutheran Church, a designated humanitarian aid shelter marked by Red Cross flags readily apparent on all four corners of the compound.   The Red Cross center provided medical assistance, food, and shelter to civilians fleeing the violence in Monrovia over the course of the armed conflict.

103.    Thomas had previously visited the Lutheran Church and was aware of its Red Cross status, and nevertheless intended to and did attack the Church.   The Lutheran Church Massacre constitutes the war crime of intentionally directing attacks against personnel or objects involved in humanitarian assistance.

104.    As pleaded in paragraphs 62 to 69, with respect to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of the war crime of intentionally directing attacks against personnel or objects involved in humanitarian assistance set forth in paragraphs 87 to 91 and 102 to 103 above.

**NINTH CLAIM FOR RELIEF: WAR CRIME OF INTENTIONALLY DIRECTING ATTACKS AGAINST A BUILDING DEDICATED TO RELIGION OR A CHARITABLE PURPOSE WHICH WAS NOT A MILITARY TARGET AT THE TIME OF THE ATTACK**
*(BY ALL PLAINTIFFS IN THEIR INDIVIDUAL CAPACITIES, AND BY PLAINTIFFS JANE W AND JOHN X AS REPRESENTATIVES OF THEIR DECEDENT ESTATES)*

105.    Thomas and the SATU and EMG forces acting under Thomas's direction targeted the Lutheran Church, an active church providing religious services, medical services, and food aid during the armed conflict.  That it was a place of worship was readily apparent.

106.    Thomas intended to and did attack the Lutheran Church.  The Lutheran Church Massacre constitutes the war crime of intentionally directing attacks against a building dedicated to religion or charitable purposes that was not a military target at the time of the attack.

107.    As pleaded in paragraphs 62 to 69, with respect to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of the war crime of intentionally directing attacks against a building dedicated to religion or a charitable purpose which was not a military target at the time of the attack set forth in paragraphs 87 to 91 and 105 to 106.

## TENTH, ELEVENTH, TWELFTH, THIRTEENTH, AND FOURTEENTH CLAIMS FOR RELIEF

### ALIEN TORT STATUTE:  CRIMES AGAINST HUMANITY

108.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

109.    Thomas and the EMG and SATU forces were part of a widespread or systematic attack directed against the civilian population in Monrovia and Nimba County.  This campaign of terror consisted of multiple incidents of organized violence, including the acts of murder and

other inhumane acts alleged herein, as well as extermination, imprisonment or other severe deprivation of physical liberty, and persecution against individuals based on their political, racial, national, ethnic, or cultural identity committed over the course of the Lutheran Church Massacre.

110.    The acts described in Claims Ten through Fourteen constitute crimes against humanity, and each one is therefore a "tort . . . committed in violation of the laws of nations or a treaty of the United States" under the ATS, 28 U.S.C. § 1350. The acts were in violation of customary international law prohibiting crimes against humanity as reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

### CONTEXTUAL ELEMENTS

111.    Following the invasion by Taylor's forces on December 24, 1989, Thomas and members of the SATU and EMG forces arrested, detained, subjected to sexual violence, subjected to cruel inhuman or degrading treatment, tortured, and killed ethnic Manos and Gios and civilians from Nimba County, who were presumed to be supportive of Taylor's rebellion.

112.    The attack on the civilian population was widespread within Monrovia and throughout Liberia.  The Lutheran Church Massacre alone resulted in the death of 600 civilians, and the remaining 1,400 civilians in the Lutheran Church were the victims of attempted murder and other inhumane acts.  In the months preceding the Lutheran Church Massacre, government forces repeatedly targeted Mano, Gio and other civilians as described at paragraphs 15 to 21.

113.    The attack on the civilian population was also systematic.  All of the acts described herein deliberately targeted individuals perceived to support the NPFL or other insurgent forces.  Attacks on civilian populations described at paragraphs 15 to 21 reflected

systematic ethnic targeting in an attempt to exterminate possible insurgents within Monrovia as Taylor's NPFL approached the city.

114.    Thomas knew of and participated in the ongoing widespread and systematic attacks against the civilian population in Liberia.  He ordered the Lutheran Church Massacre intending it to be, and knowing that it was, part of the ongoing widespread and systematic attacks against the civilian population.

115.    The Lutheran Church Massacre was directed against a civilian population pursuant to a military and government policy to eliminate civilians perceived as sympathetic to the NPFL.  Thomas and the SATU and EMG forces acting under his direction and control committed the acts described herein under actual or apparent authority, or color of law, of the Republic of Liberia and the AFL during the administration of President Doe.  Thomas visited the church prior to and during the Lutheran Church Massacre.  He had opportunity to see that the church was a designated Red Cross humanitarian aid shelter holding close to two thousand unarmed civilians.  Thomas therefore had no reason to think that the Church was a legitimate military target.

116.    Thomas targeted Plaintiffs, their family members, and other victims of the Lutheran Church Massacre because of their tribal affiliation.

### TENTH CLAIM FOR RELIEF: CRIME AGAINST HUMANITY OF TORTURE, AND OTHER INHUMANE ACTS *(BY ALL PLAINTIFFS IN THEIR INDIVIDUAL CAPACITIES, AND BY PLAINTIFFS JANE W AND JOHN X AS REPRESENTATIVES OF THEIR DECEDENT ESTATES)*

117.    As part of this widespread or systematic attack, Thomas and other members of the AFL subjected Plaintiffs and their family members to torture, and other inhumane acts at St. Peter's Lutheran Church, as alleged in Claims Three and Four herein. Such acts amount to crimes against humanity for torture, and other inhumane acts in violation of international law.

106612680v.1

118.     As pleaded in paragraphs 62 to 69, with regard to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of the crime against humanity of torture and other inhumane acts set forth in paragraphs 108 to 116 above.

**ELEVENTH CLAIM FOR RELIEF: CRIME AGAINST HUMANITY OF IMPRISONMENT OR OTHER SEVERE DEPRIVATION OF PHYSICAL LIBERTY (BY ALL PLAINTIFFS IN THEIR INDIVIDUAL CAPACITIES, AND BY PLAINTIFFS JANE W AND JOHN X AS REPRESENTATIVES OF THEIR DECEDENT ESTATES)**

119.     By surrounding the Lutheran Church compound so that people could not escape, and shooting or hacking to death those who attempted to flee, Thomas and soldiers from the SATU and EMG imprisoned or otherwise severely deprived Plaintiffs and their family members of their physical liberty in violation of fundamental rules of international law, including the freedom from arbitrary deprivation of life and security of person, and Thomas knowingly ordered and participated in this conduct as part of a widespread and systematic attack on the civilian population.   As a result, these acts constitute the crime against humanity of imprisonment or other severe deprivation of physical liberty in violation of international law.

120.     As pleaded in paragraphs 62 to 69, with regard to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of the crime against humanity of imprisonment or other severe deprivation of physical liberty set forth in paragraphs 108 to 116 and 119 above.

**TWELFTH CLAIM FOR RELIEF: CRIME AGAINST HUMANITY OF PERSECUTION**
*(BY ALL PLAINTIFFS IN THEIR INDIVIDUAL CAPACITIES, AND BY PLAINTIFFS*
*JANE W AND JOHN X AS REPRESENTATIVES OF THEIR DECEDENT ESTATES)*

121.    As part of the widespread or systematic attack, Thomas and soldiers from the SATU and EMG forces subjected Plaintiffs and their family members to a series of unlawful acts, including murder and attempted murder, imprisonment, and other inhumane acts in violation of international law.   Thomas targeted Plaintiffs, their family members, and other victims of the Lutheran Church Massacre because of their tribal affiliation.   Plaintiffs and their family members were severely deprived of their fundamental rights due to that discriminatory targeting, which is impermissible under international law.   The discriminatory attack therefore amounts to a crime against humanity of persecution in violation of international law.

122.    As pleaded in paragraphs 62 to 69, with regard to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of the crime against humanity of persecution set forth in paragraphs 108 to 116 and 121 above.

**THIRTEENTH CLAIM FOR RELIEF: CRIME AGAINST HUMANITY OF MURDER**
*(BY PLAINTIFFS JANE W AND JOHN X IN THEIR INDIVIDUAL*
*CAPACITIES, AND AS REPRESENTATIVES OF THEIR DECEDENT ESTATES)*

123.    During the Lutheran Church Massacre on July 29, 1990, James W (Jane W's husband), Julie and Jen W (Jane W's two daughters), Jane X (John X's wife), Julie X (John X's daughter), James and Joseph X (John X's two brothers) were each killed by SATU and/or EMG soldiers.   Thomas knew that the murders were committed as part of a widespread or systematic attack on the civilian population.   Such acts amount to crimes against humanity for murder, in violation of international law.

124.   As pleaded in paragraphs 62 to 69, with regard to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of the crime against humanity of murder set forth in paragraphs 108 to 116 and 123 above.

### FOURTEENTH CLAIM FOR RELIEF: CRIME AGAINST HUMANITY OF EXTERMINATION (BY PLAINTIFFS JANE W AND JOHN X IN THEIR INDIVIDUAL CAPACITIES, AND AS REPRESENTATIVES OF THEIR DECEDENT ESTATES)

125.   Thomas and SATU and EMG forces killed six hundred civilians at the Lutheran Church, including the decedent family members of Plaintiffs Jane W and John X, as detailed in Claim One herein.  The Lutheran Church Massacre constituted, or took place as part of, a mass killing of the civilian population, and Thomas knowingly committed the attack as part of a larger widespread and systematic attack against the civilian population.   Thomas's acts therefore amount to a crime against humanity of extermination in violation of international law.

126.   As pleaded in paragraphs 62 to 69, with regard to the Lutheran Church Massacre, Thomas exercised command responsibility over, conspired with, ordered, incited, and solicited, aided and abetted, co-perpetrated and/or participated in a joint criminal enterprise with SATU and EMG forces, or persons or groups acting in coordination with the AFL or under their control in committing the acts of the crime against humanity of extermination set forth in paragraphs 108 to 116 and 125 above.

### DAMAGES WITH RESPECT TO ALL CLAIMS

127.   As a direct and proximate result of Thomas's unlawful and outrageous conduct and intentional or reckless infliction of emotional distress as described herein, Plaintiffs have suffered, and will continue to suffer, severe mental anguish and emotional distress, as well as

36

physical pain and suffering.  As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

128.    In addition, as a direct and proximate result of Thomas's unlawful and outrageous conduct and intentional or reckless infliction of emotional distress as described herein, Plaintiffs' decedents suffered severe mental anguish and emotional distress, as well as physical pain and suffering, prior to their deaths.  As a direct and proximate result of Thomas's wrongful killing of Jane W's and John X's decedents, Plaintiffs have suffered and will continue to suffer from loss of companionship, support and services.  In addition, their decedents' wrongful killings, as well as their suffering prior to death, inflicted severe mental pain and suffering on Plaintiffs Jane W and John X.  As a result, Plaintiffs Jane W and John X and the estates of their decedents have suffered damages in an amount to be determined at trial.

129.    Thomas's acts and omissions, or those of his subordinates or agents, as described herein, were malicious, wanton, willful, and oppressive, and exhibited a reckless indifference to Plaintiffs' rights and those of their family members.  Consequently, Plaintiffs are entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Thomas as follows:

(a)    For compensatory damages according to proof;

(b)    For punitive and exemplary damages according to proof;

(c)    For reasonable attorneys' fees and costs of suit, according to proof; and

(d)    For such other and further relief as the court may deem just and proper.

106612680v.1

### JURY TRIAL REQUEST

Plaintiffs request a trial by jury for each claim for relief and all triable issues.

/s Nushin Sarkarati

Nushin Sarkarati, Esquire
(*pro hac vice to be filed*)
Carmen Cheung, Esquire
(*pro hac vice to be filed*)
Kathy Roberts, Esquire
(*pro hac vice to be filed*)
CENTER FOR JUSTICE AND ACCOUNTABILITY
One Hallidie Plaza, Suite 406
San Francisco, CA 94102
T: +1-415-544-0444
F: +1-415-544-0456

Laurence S. Shtasel, Esquire
Pennsylvania Bar No. 58528
James T. Giles, Esquire
Pennsylvania Bar No. 4425
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
T: +1-215-569-5500
F: +1-215-569-5555

*Counsel for Plaintiffs*


DATED:        February 12, 2018


/s Catherin Amirfar

Catherine Amirfar, Esquire
(*pro hac vice to be filed*)
Matthew E. Fishbein, Esquire
(*pro hac vice to be filed*)
Sonia R. Farber, Esquire
(*pro hac vice to be filed*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
T: +1-212-909-6000
F: +1-212-909-6836

106612680v.1