**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JANE W., in her individual capacity, and in her capacity as the personal representative of the estates of her relatives, James W., Julie W., and Jen W., *et al.*, | : : : : : | CIVIL ACTION |
| Plaintiffs, | : | NO. 18-569 |
| v. | : : | |
| MOSES W. THOMAS, | : : | |
| Defendant. | : | |

**MEMORANDUM**

TUCKER, J.                                                    September 15, 2021

**I.       INTRODUCTION**

Plaintiffs are survivors of a brutal attack on a church sanctuary over thirty years ago, during the First Liberian Civil War. Defendant Moses W. Thomas, then a colonel commanding an elite unit of the Liberian military, faces claims under the Torture Victim Protection Act, 28 U.S.C. § 1350 note, and the Alien Tort Statute, 28 U.S.C. § 1350. He is accused of a variety of war crimes and crimes against humanity relating to his command of soldiers who killed approximately 600 civilians at St. Peter's Lutheran Church in Monrovia, Liberia.

In the intervening years, Thomas immigrated to the United States. He resided in a Philadelphia suburb at the time this lawsuit was filed. Before the Court are Plaintiffs' Motion for Summary Judgment (ECF 29), Defendant's Response in Opposition (ECF 63), and Plaintiffs' Reply in Support (ECF 64), along with Plaintiffs' Motion for a Supplemental Protective Order (ECF 59). Upon careful consideration of the Parties' submissions, and for the reasons outlined below, Plaintiffs' motions are granted.

## Table of Contents

I.    INTRODUCTION ...................................................................................................... 1

Table of Contents ................................................................................................................ 2

II.   PROCEDURAL BACKGROUND .......................................................................... 3

III.  FACTUAL BACKGROUND ................................................................................... 4

   A.   The Liberian Civil Wars in Brief ............................................................................ 4

   B.   Defendant's Role in the Liberian Armed Forces .................................................... 6

   C.   Killings of Civilians During the First Civil War .................................................... 7

   D.   The Role of the Lutheran Church ............................................................................ 9

   E.   Events on the Night of the Lutheran Church Massacre ......................................... 10

   F.   The Immediate Aftermath ...................................................................................... 12

   G.   Plaintiffs' Claimed Harms from the Massacre ...................................................... 13

   H.   Lack of Accountability for the Massacre ............................................................... 13

IV.   LEGAL STANDARD ............................................................................................. 14

V.    DISCUSSION .......................................................................................................... 16

   A.   Defenses to Jurisdiction, as This Court Previously Held, do not Apply .............. 16
      1.   Statute of Limitations—Tolling Under the TVPA ............................................. 17
      2.   Statute of Limitations—Tolling Under the ATS ............................................... 20
      3.   Local Remedies Were Inadequate ..................................................................... 21
      4.   The Events at Issue "Touch and Concern" the United States ........................... 23

   B.   Defendant Fails to Cast Doubt on Plaintiffs' Voluminous Evidentiary Record .... 24
      1.   Defendant's Fragmentary Hearsay Claims Fall Under Hearsay Exceptions ... 24
      2.   Purported Inconsistencies Between Plaintiffs' Affidavits do not Negate Evidence of Defendant's Liability ....................................................................................................... 27

   C.   Defendant's Substantive Liability Under the TVPA ............................................. 28
      1.   Defendant Acted Under Color of Law ............................................................... 29
      2.   Plaintiffs' Decedents were Subjected to Extrajudicial Killing Under the TVPA ... 30
      3.   Plaintiffs were Subjected to Attempted Extrajudicial Killing Under the TVPA .... 31
      4.   Plaintiffs were Subjected to Torture Under the TVPA ...................................... 32

   D.   Defendant's Substantive Liability Under the ATS ................................................ 35
      1.   Defendant is Liable for Cruel, Inhuman, or Degrading Treatment .................. 36
      2.   Defendant is Liable for War Crimes .................................................................. 37
      3.   Defendant is Liable for Crimes Against Humanity ........................................... 40

   E.   Defendant is Directly Liable Under Both Statutes ................................................ 45
      1.   Defendant Directed or Ordered the Massacre .................................................. 46
      2.   Defendant is Liable on the Basis of Command Responsibility ......................... 48

   F.   The Additional Protective Order is Granted ......................................................... 50

   G.   An Evaluation of Damages Will be Conducted Separately ................................... 51

VI.   CONCLUSION ....................................................................................................... 51

## II.      PROCEDURAL BACKGROUND

Four survivors of the July 29, 1990 mass killing at St. Peter's Lutheran Church in Monrovia, Liberia—John Y, John Z, Jane W, and John X—filed this suit against Moses W. Thomas.[1] Compl. (ECF 1). Thomas, who Plaintiffs named as the sole Defendant in their February 12, 2018 Complaint, was a colonel in the Armed Forces of Liberia (AFL) and the commander of the elite Special Anti-Terrorist Unit (SATU). Mot. Summ. J. (ECF 29) 1. Thomas filed a Motion to Dismiss on April 26, 2018, which this Court denied. *See Jane W. v. Thomas*, 354 F. Supp. 3d 630 (E.D. Pa. 2018). Through the next two years, the case proceeded unremarkably; Plaintiffs sought discovery from Defendant and he initially participated, submitting initial disclosures on January 31, 2019, and amended disclosures on August 7, 2019. Mot. Summ. J. 23.

Things changed, however, when Defendant failed to respond to Plaintiffs' first set of document requests and interrogatories, served on October 11, 2019. Pls'. Letter re: Ext. Disc., May 6, 2020 (ECF 49). On February 7, 2020, Plaintiffs served their First Set of Requests for Admission, which were due by March 9, 2020; Defendant did not respond, object, or request an extension by the deadline. *Id.* Plaintiffs requested extensions of the discovery deadlines on May 6 and September 29, 2020 due to the COVID-19 pandemic, which were both granted. Mot. Summ. J. 23.

At some point in late 2019, Defendant not only ceased to participate but fled the United States to Liberia. Once there, he purportedly used his local contacts to intimidate individuals suspected of being Plaintiffs or witnesses in this action. Pl.'s Mot. Suppl. Prot. Or. (ECF 59-1) 4-

---

[1] Due to justified fear of reprisals in Liberia, this Court granted Plaintiffs' Motion to Proceed Anonymously, based on the balancing test set out by the Third Circuit in *Doe v. Megless* 654 F.3d 404 (3d Cir. 2011). *See* Or. Gr. Mot. Proceed Anon. (ECF 27).

5.[2] Plaintiffs contend these threats are especially potent because several of the soldiers once under Defendant's command have ascended through the ranks of Liberia's security forces. These developments prompted the withdrawal of one potential witness from this case. *Id.*

Plaintiffs filed their Motion for Summary Judgment alongside the Motion for Supplemental Protective Order on March 16, 2021. The victims seek summary judgment on all claims except for counts five, seven, eight, ten, eleven, and thirteen, which will be dismissed without prejudice.

## III.   FACTUAL BACKGROUND

Before this opinion addresses Defendant Moses W. Thomas' liability for any of the actions he is accused of directing, we must contextualize the Lutheran Church Massacre. This section will give a basic description of: (1) what led to the internal conflicts in Liberia; (2) Defendant's role in the Liberian military and the particular place of the SATU within the armed forces; (3) why the Lutheran Church and similar locations were targeted; and (4) how Plaintiffs have dealt with the aftermath of the attacks. This section draws primarily from Plaintiffs' Motion for Summary Judgment and Statement of Stipulated Material Facts (ECF 60-4).[3] Both documents, in turn, draw on the extensive factual record assembled in the exhibits filed in this matter at ECFs 60 and 61. With some exceptions that will be addressed in Section V.B, this record is undisputed by Defendant.

### A.  The Liberian Civil Wars in Brief

In 1980, about a decade before Liberia's First Civil War, Samuel Doe and Thomas Quiwonkpa led a successful coup against then-president William Tolbert, assassinating him and

---

[2] For reasons substantially similar to those underpinning the grant of summary judgment to Plaintiffs, the Court will also approve a supplemental protective order. *See infra* Section V.F.
[3] For reasons of brevity, the Motion for Summary Judgment and the Stipulated Material Facts will be abbreviated as "MSJ" and "SMF", respectively, throughout the Factual Background section.

publicly executing thirteen members of his cabinet. SMF ¶ 4; MSJ 3. As a result, Doe became

Liberia's head of state, replacing the previous government with a military junta. SMF ¶ 4; MSJ

3. On December 24, 1989, the National Patriotic Front of Liberia (NPFL), a rebel group, invaded

a military outpost of the Armed Forces of Liberia (AFL), the country's military. *Id.* at ¶ 5. This

started the first of two civil wars that would collectively last—with a roughly two-year reprieve

in the late 90s—until 2003. *Id.*

The civil wars stemmed from ethnic tensions that date back to Liberia's founding. The

country's politics were controlled from the 1820s to the 1980 coup by "Americo-Liberians",

formerly enslaved Black Americans who colonized the country and dominated indigenous ethnic

groups.[4] Pls.' Expert Report of Amb. Dennis Jett (ECF 61-9) 6.[5] The coup, led by Doe (a

member of the Krahn ethnic group) was significant because it marked the first government led

by indigenous Liberians in the nation's history. *Id.* at 7. While Doe's government was initially

welcomed by the broad base of native Liberians, years of military and police abuse and

harassment, restrictions on civil liberties, and tactics stoking ethnic division eventually

evaporated that goodwill. *Id.* at 6-8. Doe's government favored members of his own Krahn

group, to the exclusion of two other major indigenous Liberian ethnic groups, the Manos and

Gios. *Id.* at 8.

The First Civil War began when Charles Taylor, an Americo-Liberian, assembled the

NPFL, which also had the backing of some Gios. MSJ 3. NPFL forces attacked the AFL in

Nimba County, a hotbed of opposition to Doe's regime. Jett Rpt. 8; MSJ 3. In response, Doe sent

---

[4] Americo-Liberians were only about five percent of Liberia's population. Jett Rpt. 6.
[5] Dennis Jett was Deputy Chief of Mission in the U.S. Embassy in Liberia—second in command to the U.S. Ambassador—from August 1989 to August 1991, spanning the events at the center of this case. Jett Rpt. 3. Jett was awarded the State Department's Distinguished Honor Award for his service in Liberia during this time. *Id.* He went on to serve as U.S. Ambassador to Mozambique and Peru. *Id.* at 4.

AFL forces into the area to fight the NPFL and attack Manos and Gios, assuming that members of either ethnic group were working with or sympathetic to the rebels. MSJ 3-4. The AFL also killed civilians in Monrovia, frequently based on mere suspicion of being ethnically Mano or Gio. *Id.* at 4.

The First Civil War, which lasted from 1989 to 1997, resulted in Charles Taylor becoming president of Liberia. SMF ¶ 5. The war left 200,000 civilians dead, prompted 750,000 people to flee the country, and internally displaced another 1.2 million. MSJ 4.

The Second Civil War began in 1999, when opposition groups invaded Liberia from Guinea. *Id.* Another four years of conflict would result in Taylor's resignation and the combatants signing the Accra Comprehensive Peace Agreement in August 2003, ending the war. *Id.* This was followed by a two-year transitional government and, in November 2005, the election of Ellen Johnson Sirleaf as president in the country's first democratic election. *Id.*

### B. Defendant's Role in the Liberian Armed Forces

While all of this was happening, Defendant Moses W. Thomas, who had been in the AFL since at least 1985, was commanding the Special Anti-Terrorist Unit, an elite special forces group founded by President Doe to serve as his personal guard. SMF ¶¶ 2-3; MSJ 4. While SATU formally reported to the AFL's Chief of Staff, the unit effectively answered directly to President Doe. *Id.* at 5. SATU's privileged status among the AFL ranks was also denoted by the unit's distinctive uniforms, easily distinguishable from the green-fatigued generic AFL uniform by added red berets, red t-shirts under fatigues, red collar tabs, and a unique left lapel symbol that resembled an airplane. *Id.*

Members of the AFL—including SATU—were trained on the laws of armed conflict, including lessons on the importance of distinguishing between civilian and military locations,

protecting children in wartime, and responsibilities under the Geneva Convention. William Z

Decl. (ECF 61-7) ¶ 19.[6] The Red Cross provided AFL soldiers with separate sessions on the

importance of respecting the organization's emblem as a symbol of a noncombatant shelter. *Id.*

These sessions also covered rules prohibiting attacks on places of worship. *Id.* Each member of

the AFL received a copy of the United States Uniform Code of Military Justice—which Liberia

had adopted—laying out the ethical obligations of soldiers and consequences for rule violations.

*Id.* at ¶ 21.

Thomas, as a senior officer, would have received these trainings. He exercised control

over the SATU, and members of the unit only took orders from Thomas or their sub-unit

commander. *Id.* at 30. Thomas's colonel rank meant that he could also command lower ranking

soldiers in other units of the AFL. *Id.* Members of the SATU generally did not take orders from

those outside the unit, even when engaged in joint operations with other arms of the AFL. *Id.*

**C.  Killings of Civilians During the First Civil War**

As spring turned to summer in 1990, rebel forces—the NPFL and a splinter group, the

Independent National Patriotic Front of Liberia (INPFL)—approached Monrovia and threatened

to wrest control from the AFL. Pls.' Decl. Mark Huband (ECF 60-10) ¶ 8.[7] The AFL responded

to increasing rebel strength by purging ethnic Mano and Gio soldiers from their ranks,

sometimes through summary execution. Jett Rpt. 28. In June 1990, the AFL rounded up over two

hundred of its Mano and Gio servicemembers and detained them in a military prison. *Id.*; Pls.

Decl. Elizabeth Blunt (ECF 61-2) ¶ 14.[8] The soldiers were subsequently killed, and sightings of

---

[6] William Z was an active duty soldier and officer in the AFL during the First Civil War. Additional details of his service are omitted from public court filings under the protective order. William Z Decl. ¶¶ 3, 6-7.
[7] Mark Huband was a West African correspondent for two British newspapers—the *Financial Times* and later the *Guardian*—during the First Civil War. Huband Decl. ¶ 2.
[8] Elizabeth Blunt was a West Africa correspondent for the BBC from 1986 to November 1990. Blunt Decl. ¶ 3.

their mutilated bodies were soon reported across the capital. Jett Rpt. 28. Mano and Gio servicemembers who were not arrested in these sweeps began to defect *en masse* from the AFL, fearing they would be killed next.[9] *Id.* at 29. By August 1990, just after the Lutheran Church Massacre, the AFL was nearly all-Krahn. *Id.*

For similar reasons, the AFL began to target Mano and Gio civilians, assuming members of both groups were sympathetic to the rebels. Jett Rpt. 29. In the winter of 1990, hundreds of male Mano and Gio residents around Monrovia were rounded up by Doe's "followers"—in the words of a U.S. State Department report—and were detained or disappeared. *Id.* These killings intensified as winter turned to spring, with AFL soldiers at checkpoints asking individuals to prove that they were members of the favored Krahn tribe by speaking its language. *Id.* at 30. Those unable to do so were summarily executed. *Id.* Thomas' SATU unit developed "a particular reputation for brutality" in conducting these operations. Huband Decl. ¶ 10.

These killings led many Mano and Gio Liberians to seek shelter wherever they could, including schools, NGO compounds, U.N. facilities, foreign embassies, and in churches such as the Lutheran Church. Jett Decl. 30. However, the AFL began to attack these sanctuaries throughout the spring and summer of 1990. *Id.* at 32.

On May 29, 1990, AFL forces attacked the United Nations Development Program (UNDP) compound, where approximately 1,500 internally displaced Mano and Gio people had been sheltering. *Id.* Soldiers kidnapped between thirty and forty people—including women and

---

[9] Defendant Moses W. Thomas was directly implicated in at least one of these purge killings by the findings of Liberia's postwar Truth and Reconciliation Commission. *See* Jett Ex. ZZZ (ECF 61-12 at 96), Liberian Truth and Reconciliation Commission, Vol. II: Consolidated Final Report (June 30, 2009) 219 (listing in a "Catalogue of Selected Human Rights Violations" from 1979 to 2003 the "June 1990 Massacre of 27 Gio and Mano family members of the AFL by Moses Thomas [and others] . . . reportedly under orders of Samuel Doe.")

children—carting them away in military vehicles; at least eight were tortured and subsequently executed on a nearby beach. *Id.* As a result, the U.N. evacuated its staff from Liberia. *Id.*

About two months later, AFL forces entered the John F. Kennedy Hospital in Monrovia, where other internally displaced Liberians had been sheltering. *Id.* Plaintiff John Y, a member of the Mano ethnic group, was one of the civilians seeking refuge at JFK Hospital when AFL forces arrived. Pls.' Decl. John Y (ECF 60-7) ¶ 11. He saw the soldiers arrive in three trucks, run after civilians sheltering in the yard, and take them away. *Id.* An estimated 250 civilians were taken from the hospital in this operation and subsequently executed. MSJ 9.

The escalation in sectarian violence leading up to the Lutheran Church Massacre was well documented by domestic and international media, as well as by U.S. diplomatic and intelligence officials. Jett Decl. 33-34. Both the U.S. Embassy in Liberia and Congress formally denounced the violence. *Id.* at 34-35.

**D.  The Role of the Lutheran Church**

After the attack on the UNDP compound, the head of the Lutheran Church of Liberia invited survivors to stay at St. Peter's Lutheran Church in Sinkor, Monrovia. Jett Rpt. 35; Pls.' Decl. William X (ECF 61-6) ) ¶ 4.[10] The church was adorned with Red Cross and UN flags, making clear the building served a humanitarian purpose. *Id.* at ¶ 7; MSJ 11. The church continued to hold religious services after it converted to a shelter. William X Decl. ¶ 8. Those sheltering at the church mostly slept on the main and upstairs levels of the church and an attached schoolhouse. *Id.* ¶ 13. Unarmed volunteer lookouts—members of the congregation— kept watch over both entrances to the church compound. *Id.* ¶ 14. The Red Cross also banned weapons from the church. MSJ 11.

---

[10] William X was a member of the St. Peter's congregation during the First Civil War. Additional details are omitted from public court filings under the protective order. William X Decl. ¶ 2.

By the summer of 1990, the Lutheran Church had the largest concentration of displaced Mano and Gio people in the capital. Huband Decl. ¶ 15. However, the site was understood to be a likely AFL target. *Id.*

Before the Lutheran Church Massacre, members of Defendant's SATU force visited the compound. Plaintiff Jane W saw the soldiers surround the church a week after her mid-July arrival at St. Peter's. Pls.' Decl. Jane W (ECF 60-5) ¶ 13. Plaintiff John Z also witnessed AFL soldiers driving past the compound multiple times before the Massacre, shouting threats intended to intimidate the refugees. Pls.' Decl. John Z (ECF 60-8) ¶ 8. Soldiers reportedly shot into the air and rattled the gates outside the church before the Massacre. Huband Decl. ¶ 15.

### E.  Events on the Night of the Lutheran Church Massacre

The night of July 29, 1990, SATU and other AFL forces, including the Tilley Death Squad,[11] attacked the Lutheran Church. MSJ 12. Plaintiff John Z witnessed soldiers surround the compound's fence around midnight. John Z Decl. ¶ 14. Troops breached the fence and fanned out into the church and adjacent school building. *Id.* Plaintiff John Y witnessed a soldier inside the compound say, in English, "you people think that you are rebels, but we will prove to you today that we are more rebel than you." John Y Decl. ¶ 22. John Y then saw a soldier lower a gas lamp and fire a pistol, which was followed by the rest of the soldiers beginning to fire into the crowds. *Id.* As the violence began, those sheltering in the Church began to run wherever they

---

[11] Another unit of the AFL with a privileged direct-report relationship to President Doe similar to SATU was Colonel Marcus Tilley's "Death Squad". William Z Decl. ¶ 33. This unit, which numbered around twenty men, was less trained than the SATU and more indiscriminate in its brutality. *Id.* at ¶ 34. This unit was also implicated in the Massacre. *See* Pls.' Decl. Patrick Robert (ECF 61-3) ¶ 14 (explaining interviews with survivors of the Massacre who stated the Death Squad participated in the killing). Patrick Robert was a photojournalist for Sygma, a French photo news agency, during the First Civil War. Robert Decl. ¶ 2.
Despite the involvement of the Death Squad in the Massacre, there is no dispute that Defendant was the primary commander of the AFL forces involved in the killings. *See* Section III.E.

could: some ran outside and tried to jump through windows, while those outside in the courtyard ran inside. *Id.* at 22; John Z Decl. ¶ 14.

Several people, including some Plaintiffs, saw Defendant in and around the Church during the Massacre. MSJ 14. William Y, another AFL soldier, was stationed on a nearby beach in Monrovia that night and heard the gunfire. Pls.' Decl. William Y (ECF 60-9) ¶ 11.[12] When he got to the church, he saw many members of the SATU, as marked by the distinctive red-accented uniforms. *Id.* at 12. The killing was still ongoing when William Y saw Moses Thomas standing by a flagpole inside the church compound fence. *Id.* at 14. Moses was holding a pistol, which only senior AFL officers could carry. *Id.* Thomas, who was the only commander William Y saw in the area, ordered him back to his post on the beach. *Id.* Plaintiff John Z also saw Thomas inside the compound. John Z Decl. ¶ 17.

After about an hour, Defendant Thomas was seen walking from the front gate to the church and yelling to the soldiers, "ceasefire, all soldiers out." *Id.* at ¶ 19. He moved from the main church building to the school building and courtyard, repeating the order multiple times. *Id.* Soldiers began to leave. Thomas then walked to the front of the church and looked inside. *Id.* at ¶ 20. He then said, "everyone is dead. All soldiers out," which prompted the remaining forces to leave. *Id.*

Many survivors of the Massacre, including Plaintiffs, survived by hiding under multiple dead bodies. MSJ 14.

The threat of further violence from the AFL meant that bodies from the Church Massacre were not recovered for weeks. Jett Rpt. 37. The U.S. Embassy initially estimated 200 people had

---

[12] William Y was an active duty soldier in the AFL during the First Civil War. Additional details of his service are omitted from public court filings under the protective order. William Y Decl. ¶¶ 2-3.

been murdered, but a subsequent U.N. investigation estimated about 600 civilians were killed in the attack. *Id.*

**F.  The Immediate Aftermath**

Civilians who survived the Lutheran Church Massacre remained in danger. AFL soldiers prevented Red Cross workers from transporting the wounded inside the church to hospitals. John Y Decl. ¶ 28. Others, including Plaintiff John Y, were chased away from the church by AFL forces when they tried to look for survivors inside the compound. *Id.*

The wounded who were able to escape the compound sought medical attention at a nearby U.S. Agency for International Development (USAID) compound. Jett Rpt. 38. As these people were treated, AFL soldiers passed on neighboring streets, shooting into the air. Pls.' Decl. Andrew Voros (ECF 61-4) ¶ 20.[13] The soldiers later attacked the USAID compound, removed the survivors, and subsequently executed them. Jett Rpt. 38; MSJ 17.

Other survivors fled to the J.J. Roberts School, joining about 1,200 other internally displaced Manos and Gios already being attended to by Red Cross staffers. Pls.' Decl. John X (ECF 60-6) ¶ 33. A soldier warned those sheltering at the school that it was the next target. *Id.* at 34. On July 30, 1990, around 2:00 PM, the soldiers arrived and began sweeping through the school, killing those sheltering there. *Id.* at ¶ 37. At least one of the men killed was wearing clothing with Red Cross iconography. *Id.*

Violence continued in the weeks that followed, with AFL soldiers looting the American Cooperative School and the home of a U.S. Embassy official. MSJ 18. Soldiers also executed civilians, including a U.S. missionary in Monrovia. *Id.*

---

[13] Andrew Voros was a U.S. expat living in the USAID compound around the time of the Lutheran Church Massacre. Voros Decl. ¶¶ 7, 12.

**G. Plaintiffs' Claimed Harms from the Massacre**

Plaintiffs John X, John Y, John Z, and Jane W all sheltered at the Lutheran Church when the slaughter occurred. MSJ 14. Plaintiffs point to that night's lasting impact on their lives.

John X mourns the loss of his wife, daughter and brothers. He was stymied in his education by the need to care for his extended family alone. MSJ 19.

John Y was haunted by visions of the dead—including remains of his aunt and her unborn child he saw the morning after the Massacre —for years. *Id.* John Y now is frightened by police encounters, as they trigger memories of the killings. *Id.* He suffered a gunshot wound to his leg which limits his physical activity to this day. *Id.*

John Z suffers "debilitating headaches" when remembering the Massacre and faces enduring emotional trauma. *Id.*

Jane W has trouble sleeping when she thinks of her husband and daughters, killed in the Massacre. *Id.* She still has difficulty discussing the events of that night with her family. *Id.* at 20.

**H. Lack of Accountability for the Massacre**

The decade of continuing sectarian violence led to a vacuum of accountability for the killings. The First Civil War itself did not end until 1997. SMF ¶ 5. The political situation remained unsettled in the interregnum between the civil wars. MSJ 20. From the end of the Second Civil War, in 2003, to President Ellen Johnson Sirleaf's inauguration in January 2006, Liberia remained under a transitional government. SMF ¶¶ 7-8. Each avenue of potential accountability for the Massacre, from the military to civilian justice systems and a Truth and Reconciliation Commission, failed to punish the perpetrators.

The military justice system did not discipline anyone involved in the Massacre. MSJ 20. The UCMJ and court martial systems remained in effect under President Doe, but were under-

enforced, especially against Krahn soldiers. Jett Rpt. 41. Defendant was not punished for his role in the Massacre and was instead promoted to Director of the Defense Intelligence Service. William Z Decl. ¶¶ 31, 38. President Doe officially blamed the massacre on NPFL rebels, foreclosing any government investigation. *Id.* at ¶¶ 37-38.

Civilian courts also failed to provide any remedy for the victims; the judiciary had collapsed by the start of the First Civil War and was unable to function during the conflict. MSJ 21. Even after the courts were re-constituted, concerns lingered about their lack of due process, political independence, opacity, and corruption. These concerns remained, to some degree, into the 2000s and 2010s. *Id.*

The Truth and Reconciliation Commission that began after the Second Civil War also fell short of expectations, as the Liberian Supreme Court ruled in 2011 that the body's recommendations did not bind the national government. *Id.* at 22.

No cases have been prosecuted in Liberia for human rights abuses committed during the Civil Wars, and multiple individuals implicated in atrocities now hold senior political offices. MSJ 22.

Unbeknownst to Plaintiffs, Moses Thomas immigrated to the United States around 2000. SMF ¶ 14; MSJ 23. Defendant did not disclose his involvement in the Massacre to U.S. immigration officials. MSJ 22. Defendant was a resident of Sharon Hill in Delaware County, Pennsylvania until at least 2019, despite an outstanding removal order. *Id.* at 22-23.

## IV.   LEGAL STANDARD

Summary judgment can only be awarded when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for

summary judgment, there must be a factual dispute that is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49, (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## V.     DISCUSSION

Given the weight of the evidence provided, this Court finds Defendant liable under both the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350 note, and the Alien Tort Statute (ATS), 28 U.S.C. § 1350. This opinion will first discuss why defenses to jurisdiction are inapplicable in this case. Then, it will detail how Defendant's claims of hearsay do not dent the vast factual record assembled by Plaintiffs in this case. Third, the opinion will detail how Defendant is liable under the TVPA and the ATS both directly and through command responsibility theories. Finally, the opinion will address matters relating to the protective order and a damages evaluation.

### A.  Defenses to Jurisdiction, as This Court Previously Held, do not Apply

There are three potential defenses that could bar a lawsuit seeking redress for human rights violations committed many years ago, outside of the U.S. The first and most intuitive defense is the statute of limitations under both the TVPA and the ATS, as the Lutheran Church Massacre occurred over thirty years ago. Second, a plaintiff under the TVPA is required to exhaust local remedies before bringing an action in a U.S. court. Third, a claim under the ATS must "touch and concern" the United States—put simply, the matter must have enough of a connection to America to be tried by American jurists. While this Court addressed these matters at the Rule 12 motion to dismiss stage, Plaintiffs have conclusively met the bar of demonstrating all three of these elements for the purposes of a Rule 56 summary judgment motion.

Defendant's previously asserted defenses—based on the statute of limitations and the TVPA's exhaustion requirement—are affirmative defenses. *See, e.g.*, *Jean v. Dorelien*, 431 F.3d

776, 781 (11th Cir. 2005) ("the exhaustion requirement pursuant to the TVPA is an affirmative defense"); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 461-62 (D.N.J. 1999) (ruling defenses based on statutes of limitations are affirmative defenses). Therefore, Defendant bears the burden of proof on these matters. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (nothing that on an issue where the party opposing summary judgment has a burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

Defendant did not reassert any of these jurisdictional defenses at the summary judgment stage. Even so, the Court addresses them here for the purposes of a complete record.

1. *Statute of Limitations—Tolling Under the TVPA*

The Torture Victim Protection Act has a ten-year statute of limitations. 28 U.S.C. § 1350, note, § 2(c). However, equitable tolling is available to stop the running of a statute of limitations under extraordinary circumstances. *United States v. Midgley*, 142 F.3d 174, 179 (3d Cir. 1998) ("[E]quitable tolling may be appropriate if . . . the plaintiff has 'in some extraordinary way' been prevented from asserting his rights"). As this Court has previously ruled, "[t]he existence of an ongoing civil war or the existence of a hostile local government where the events giving rise to the claim are located . . . can be grounds for equitable tolling of the TVPA limitations period." *Jane W. v. Thomas*, 354 F. Supp. 3d 630, 635 (E.D. Pa. 2018) (citing *Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006); *Chavez v. Carranza*, 407 F. Supp. 2d 925, 928 (W.D. Tenn. 2004)). Fear of violent reprisal by a potential defendant or their allies may also toll the TVPA limitations period. *See, e.g.*, *Hilao v. Est. of Marcos*, 103 F.3d 767, 773 (9th Cir. 1996) (ruling substantiated fear of "intimidation and reprisals" can toll the TVPA period).

The statute of limitations can also be tolled by a defendant's absence from "the United States or from any jurisdiction in which the same or a similar action arising from the same facts may be maintained by the plaintiff." *Jean v. Dorelien*, 431 F.3d 776, 780 (11th Cir. 2005) (citing S. Rep. No. 102-249, at 11 (1991)). This is particularly applicable when a defendant conceals their identity or whereabouts. *Jane W.*, 354 F. Supp. 3d at 635 (citing *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1155-56 (11th Cir. 2005)).

This Court held that Plaintiffs already established four elements for tolling the statute of limitations at the motion to dismiss stage: "(1) Liberia's two civil wars and its unstable government—which has consistently equivocated over the handling of allegations of war crimes; (2) Plaintiffs' justifiable fear of violent reprisal were they to speak out in Liberia about the Lutheran Church Massacre; (3) Defendant's absence from the United States, which has hampered the Plaintiffs' ability to investigate their claims; and (4) Defendant's alleged concealment of his identity and his involvement in the perpetration of war crimes and human rights abuses." *Id.* After discovery and summary judgment briefing by the parties, Plaintiffs have demonstrated each of these elements.

Plaintiffs have substantiated that their ability to pursue remedies in Liberia was stymied by the civil wars and subsequent political tension. The First Civil War lasted from 1989 to 1997. Stip. Facts ¶ 5. The period in between the wars—1997 to 1999—was marked by substantial violence and instability. *Id.* The Second Civil War then lasted from 1999 to 2003. *Id.* at ¶ 6. The two years that followed the peace agreement ending the Second Civil War were under a transitional government, meaning "stability" did not begin until at least 2006. *Id.* at ¶¶ 7-8.

The establishment of the Truth and Reconciliation Commission soon after the war in February 2006 also delays the statute of limitations under the TVPA. Pls.' Liberian Country

Conditions Expert Report ("CC Rpt.") (ECF 61-13) 24.[14] In addition to an ongoing civil war,

courts have recognized that a Truth and Reconciliation process, which may lull plaintiffs into

believing they "would have had no need to conduct an independent investigation into

defendants' conduct" allows for tolling under the TVPA. *In re S. Afr. Apartheid Litig.*, 617 F.

Supp. 2d 228, 291 (S.D.N.Y. 2009). The Liberian TRC issued a preliminary report and

recommendations on July 1, 2009, and a final report on December 20, 2009, cataloging human

rights violations from 1979 to 2003. CC Rpt. 25.

    While the enabling statute for the TRC made the recommendations binding on the

Liberian government, the Supreme Court of Liberia held that portion of the TRC statute

unconstitutional in 2011. *Id.* at 28. This ruling "eviscerated" the TRC's authority to provide

meaningful justice to war crimes victims and would allow for a tolling of the TVPA limitations

period to at least 2011. *Jane W.*, 354 F. Supp. 3d at 636. These facts have been established in the

record.

    Plaintiffs have demonstrated that they lived in genuine fear of reprisal for bringing claims

of human rights abuses. *See* Mot. Summ. J. 21-22; John Y Decl. ¶ 34; Jane W Decl. ¶ 28; John Z

Decl. ¶¶ 28, 30; John X Decl. ¶¶ 44-45 (explaining generally overall fear of reprisals and

individual Plaintiffs stating they abstained from the TRC process because of fears relating to lack

of protection and uncertain accountability given the risk).

    Lack of information as to Defendant's whereabouts—Plaintiffs had no knowledge he had

moved to the U.S.—have also been substantiated. *See, e.g.*, John Z Decl. ¶ 31 ("I had heard

rumors that Moses Thomas had left the country and travelled to the Ivory Coast, so that is where

---

[14] The author of Plaintiffs' country conditions report is an expert on Liberian law and the public sector. They have testified in previous cases regarding human rights abuses in Liberia. Further details of their identity are redacted per the court's protective order. CC Rpt. 3, 6.

I assumed he was."); Jane W. Decl. ¶ 31 ("I only learned a few years ago, before I met the people working on this case . . . that the people responsible for the massacre were in the United States.").

Plaintiffs also established Defendant's concealment of his identity while immigrating to the U.S. Defendant failed to disclose his involvement in the Lutheran Church Massacre to U.S. immigration officials and relied on programs designed to help victims of political turmoil in Liberia. *See* Mot. Summ. J. 22-23; Mot. Suppl. Protective Order, Nielsen Decl., Ex. A, Pl.'s Req. for Admission ¶¶ 43-45 (showing Defendant admitted through failure to respond or otherwise object concealment of his offenses in his immigration to the U.S.).

Because each of these four elements has been substantiated, the TVPA's statute of limitations is tolled and Plaintiffs' claims are not time barred.

### 2. *Statute of Limitations—Tolling Under the ATS*

The Alien Tort Statute does not have its own limitations period. 28 U.S.C. § 1350. However, courts, including this one, have consistently ruled that the TVPA serves as the closest analogy to the ATS. As such, the TVPA ten-year statute of limitations applies. *See, e.g.*, *Jane W.*, 354 F. Supp. 3d at 637; *Chavez v. Carranza*, 559 F.3d 486, 493 (6th Cir. 2009) ("we conclude that the ten-year limitations period applicable to TVPA claims also governs claims under the ATS"); *Iwanowa*, 67 F. Supp. 2d at 462 ("Since the enactment of the TVPA, courts addressing claims under the [ATS] have applied the TVPA limitations period.").

Because Plaintiffs have demonstrated their claims are tolled under the TVPA's provisions, the ATS claims are identically tolled. *See supra* Section V.A.1 (discussion of TVPA tolling).

### 3.  *Local Remedies Were Inadequate*

A court must decline to hear a claim under the TVPA "if the claimant has not exhausted

adequate and available remedies in the place in which the conduct giving rise to the claim

occurred." 28 U.S.C. § 1350, note, § 2(c). However, this exhaustion requirement has been

effectively waived by courts in certain circumstances, such as when "it is apparent" that efforts

to pursue the same relief in the home country "would be futile." *Doe v. Exxon Mobil Corp.*, 393

F. Supp. 2d 20, 25 (D.D.C. 2005); *see also Rasoulzadeh v. Associated Press*, 574 F. Supp. 854,

861 (S.D.N.Y. 1983), *aff'd,* 767 F.2d 908 (2d Cir. 1985) ("A motion to relegate a plaintiff to a

foreign forum will be denied if the plaintiff shows that foreign law is inadequate, or that

conditions in the foreign forum plainly demonstrate that the plaintiffs are highly unlikely to

obtain basic justice therein.") (internal quotations omitted).

In explaining the purpose of the TVPA, Congress noted that "in most instances the

initiation of litigation under this legislation will be virtually *prima facie* evidence that the

claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred," and

courts should approach cases under the TVPA with this assumption. *Hilao v. Est. of Marcos*, 103

F.3d 767, 778 n.5 (9th Cir. 1996) (citing S. Rep. No. 102-249 at 9-10 (1991)). As a result,

Defendant has the burden of demonstrating Plaintiffs had domestic remedies in Liberia that they

did not exhaust. *Id.* Defendant Thomas has not.

At the motion to dismiss stage, this Court determined Plaintiffs had successfully alleged:

"(1) the fact that Liberia has never prosecuted a single war crime arising from the civil wars; (2)

the fact that Plaintiffs live under a persistent threat of retaliation and would likely face retaliation

if they were to seek redress in Liberia; and (3) the fact that the Liberian judiciary appears unable

or unwilling to provide an adequate forum for the pursuit of claims rooted in the civil wars."

*Jane W.*, 354 F. Supp. 3d at 638. These allegations have been substantiated after discovery and summary judgment briefing by the parties.

Plaintiffs have demonstrated through the record that there has been no evidence of domestic criminal or civil accountability for war crimes or human rights violations tied to the Liberian Civil Wars. CC Rpt. 28-29. ("In addition, no Liberians have successfully brought civil cases for Civil Wars-era abuses. The only cases seeking accountability for these violations have all occurred . . . in Europe and the United States.").

Plaintiffs have also demonstrated that they are subject to an ongoing risk of retaliation in Liberia. *See supra* Section V.A.1; Mot. Summ. J. 21-22. Ongoing risk of retaliation excuses exhaustion under the TVPA, due to the futility of local remedies. *See Jean v. Dorelien*, 431 F.3d 776, 783 (11th Cir. 2005) ("[defendant] does not dispute that those involved with prosecuting him for the [subject] Massacre have been targets of violence, nor does he assert that the political structure is such that [plaintiff] could presently file her claims in Haiti and be successful."); *In re Chiquita Brands*, 190 F. Supp. 3d 1100, 1113 n.16 (S.D. Fla. 2016) (citing *Estate of Rodriguez v Drummond Co.*, 256 F. Supp. 2d 1250, 1267-68 (N.D. Ala. 2003)).

Lastly, Plaintiffs have demonstrated through record evidence that the Liberian judiciary does not function in a manner that allows them to reasonably pursue their claims. *See* CC Rpt. 14-19 (describing problems of poor legal infrastructure, corruption, and lack of professionalism in police forces that stymie accountability for human rights abuses). Courts have repeatedly ruled that evidence of unstable local judiciaries excuses TVPA exhaustion. *See, e.g.*, *Ahmed v. Magan*, No. 2:10-CV-342, 2011 WL 13160129, at *5 (S.D. Ohio Nov. 7, 2011) ("Because there is conflicting evidence regarding whether Plaintiff had an adequate and available legal remedy in Somalia, Defendant cannot demonstrate that, as a matter of law, Plaintiff failed to exhaust his

remedies"); *Mushikiwabo v. Barayagwiza*, No. 94 CIV. 3627 (JSM), 1996 WL 164496, at *2 (S.D.N.Y. Apr. 9, 1996) ("Plaintiffs have fulfilled the exhaustion requirement of the TVPA by demonstrating that the Rwandan judicial system is virtually inoperative and will be unable to deal with civil claims in the near future.").

Based on all of these elements, Defendant has not met his burden for demonstrating Plaintiffs failed to exhaust local remedies under the TVPA.

4. *The Events at Issue "Touch and Concern" the United States*

Lastly, this Court ruled at the motion to dismiss stage that Plaintiffs' claims met the Supreme Court's "touch and concern" test for ATS jurisdiction. *Jane W.*, 354 F. Supp. 3d at 638. This test, set out in *Kiobel v. Royal Dutch Petrol. Co.*, holds that a federal court can only maintain jurisdiction over ATS claims if they "touch and concern the territory of the United States" with enough intensity to "displace the presumption against extraterritorial application." 569 U.S. 108, 125 (2013).[15]

Based on the factors of the "touch and concern" test, this Court determined that three aspects of this case supported jurisdiction under the ATS: "[(1)] Defendant's alleged involvement in the violent raid of a USAID compound under the control of a United States agency; [(2)] Defendant's residence in the United States; and [(3)] Defendant's allegedly fraudulent participation in a U.S. visa and immigration program designed to benefit the victims of the crimes that Defendant himself allegedly perpetrated." *Jane W.*, 354 F. Supp. 3d at 639.

As with the other jurisdictional questions, the record presented by Plaintiffs bears out this Court's earlier analysis. Plaintiffs have presented record evidence of Defendant's command involvement in the USAID compound attack. *See* Voros Decl. ¶ 21; Jett Rpt. 38. Defendant's

---

[15] For detailed discussion of this initial evaluation, *see Jane W.*, 354 F. Supp. 3d at 638-639.

long-term residence in the U.S. at the time this action commenced is undisputed. Stip. Facts ¶¶ 14-16. Lastly, Plaintiffs have demonstrated, through Defendant's un-answered admissions, that his immigration to the U.S. involved deception as to his role in the Massacre. *See* Pl.'s Req. for Admission ¶¶ 43-45.

Based on all of these substantiated elements, Plaintiffs' suit meets each jurisdictional basis this Court addressed at the motion to dismiss stage.

### B. Defendant Fails to Cast Doubt on Plaintiffs' Voluminous Evidentiary Record

Plaintiffs' claims also withstand the farrago of hearsay and inconsistency claims Defendant asserts in his response to the Motion for Summary Judgment. This section will first address the hearsay issues, and then address the claimed record inconsistencies.

#### 1. Defendant's Fragmentary Hearsay Claims Fall Under Hearsay Exceptions

Defendant argues that a large chunk of Plaintiffs' and other witnesses' affidavits make statements that should be excluded from summary judgment consideration because they constitute hearsay. However, all of these statements are admissible either because they do not constitute hearsay or fit into an established hearsay exception.

In deciding a motion for summary judgment, "only evidence which is admissible at trial may be considered" by the court. *Bouriez v. Carnegie Mellon Univ.*, No. CIV.A. 02-2104, 2005 WL 2106582, at *8 (W.D. Pa. Aug. 26, 2005) (quoting *Countryside Oil Co., Inc. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D.N.J. 1995)). Hearsay is a statement made by the declarant outside of the current trial that is offered for the truth of the matter asserted. Fed. R. Evid. 801(c). However, hearsay statements that are otherwise admissible at trial can be considered at the summary judgment stage. *Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 226 n.2 (3d Cir. 2000).

However, the statements Defendant points to are either not hearsay or admissible because they are offered not for "the truth of the matter asserted" but to show the effect on Plaintiffs and witnesses, a permitted purpose. Fed. R. Evid. 801(c); *see, e.g.*, *Kreider v. Breault*, No. CIV.A. 10-3205, 2012 WL 118326, at *1 n.2 (E.D. Pa. Jan. 13, 2012) (admitting hearsay statements incorporated into a hearsay report because they go to effect on listener). Other challenged portions fit within the hearsay exception for statements about a startling event made while the declarant was still under the stress or excitement of the event. Fed. R. Evid. 803(2). The applicability of this exception depends on the statement being contemporaneous with the excitement caused by an event, but not strictly with the time of the event. *United States v. Brown*, 254 F.3d 454, 460 (3d Cir. 2001).

Defendant points to multiple statements by Plaintiff Jane W as inadmissible hearsay. The challenged statements are: (1) a man in the Lutheran Church told her after Defendant's pre-Massacre visit that the "big man" talking to the crowd was Thomas; (2) after the Massacre a relative said Jane W's aunt was killed in the assault; (3) someone who buried bodies at the church told her they saw the bodies of Jane W's husband and daughters; and (4) her father told her he feared she would be killed if she shared her story about the Massacre to the TRC. Jane W Decl. ¶¶ 16, 26, 28.

Each of these statements are admissible despite Defendant's protests. Statements (1) and (4) are provided for their effect on Plaintiff. Statement (1) explains why Jane W "committed [Defendant's] face to [her] memory" before the Massacre. Jane W Decl. ¶ 16. Jane W identified Thomas as the man she saw at the Lutheran Church through a separate photo line-up, which Defendant does not dispute the validity of. Jane W Decl. ¶ 17. Statement (4) is provided not for

the truth of her father's fear, but for illustrating the effect on Jane W, and why she chose not to participate in the TRC process.

Statements (2) and (3), regarding the deaths of Jane W's aunt, husband, and daughters, are admissible hearsay. Those speaking to Plaintiff were still under the adrenaline of surviving the Church Massacre, which constitutes a sufficiently stressful event for the purposes of FRE 803(2)'s rationale: "that excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable." *United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001). Each of the people who spoke to Plaintiff had personally encountered the carnage of the Massacre.

Additionally, Jane W's statements fit under hearsay's "residual exception", which allows for the admission of hearsay evidence if (1) there are "sufficient guarantees of trustworthiness" given the totality of the circumstances and other corroboration, and (2) the evidence is more probative for the reasons it is offered than any other evidence the proponent could reasonably obtain. Fed. R. Evid. 807(a). Jane W's statements as to the death of her aunt, husband, and daughters are corroborated by: her testimony that these people were present with her, sheltering at the Lutheran Church before and during the Massacre, her undisputed description of the casualties, and testimony that she had not seen or heard from her family in the decades since the killings. *See* Mot. Summ J. 14-16, 18-20. These statements are also more probative than alternative evidence Jane W could reasonably procure, given the bodies of those killed in the massacre were buried in mass graves or on a beach. *Id.* at 18.

Defendant also seeks to strike two statements from Plaintiff John Y's declaration: (1) John Y's statement that he heard the AFL were targeting anyone in Monrovia originally from

Nimba—the region known for opposition to the Doe regime—and (2) a statement that three or four women in downtown Monrovia told him the AFL had attacked the UNDP compound. John Y Decl. ¶¶ 4, 6. Statement (1) was made under contemporaneous fear of imminent attack by AFL soldiers, as noted by the mention of those soldiers patrolling the neighborhood. Therefore, it would fit within the FRE 803(2), exception. Statement (2) also fits within FRE 803(2) as the women who spoke to John Y were actively seeking shelter from the attack on the UNDP compound, another sufficiently startling, and horrifying event.

Lastly, Defendant contends that a statement in William X's declaration as to AFL responsibility for the massacre should be stricken, as he did not personally witness the attack. William X Decl. ¶ 19. However, this statement was made by a woman who escaped the Massacre—also subject to the FRE 803(2) exception. Furthermore, as will be addressed in the next section, even if this statement was discounted, the record assembled by Plaintiffs—and *not* disputed by Defendant—provides corroboration of the AFL's role, and Defendant's hand in the killings.

   2.   *Purported Inconsistencies Between Plaintiffs' Affidavits do not Negate Evidence of Defendant's Liability*

Defendant cites a variety of purported inconsistencies in order to claim that witnesses lacked personal knowledge, in a broader attempt to argue issues of material fact remain.

Defendant argues that, among others, the following lines are questionable: (1) William W's statement that only AFL soldiers would have been freely operating in the area around the Lutheran Church is speculation; (2) William Y couldn't have been near the Church at the time of the killings; and (3) William Z lacks the personal knowledge to state SATU soldiers were unlikely to have taken orders from Marcus Tilley, the "Death Squad" leader. *See* William W

Decl. ¶ 31; William Y Decl. ¶¶ 10-15; William Z Decl. ¶ 34. These challenges are irrelevant to Defendant's presence at the Church on the night of the Massacre and the AFL's responsibility for the attack.

Defendant's presence at the Lutheran Church on the night in question lies beyond dispute based on the record evidence. Even if the challenge to Jane W's testimony was valid (which it is not, *see supra* Section V.B.1), both William Y and John Z place Defendant Thomas at the Church compound on July 29, 1990. William Y Decl. ¶ 14; John Z Decl. ¶¶ 17-20. Through the un-answered or objected to admissions, Defendant has also acknowledged his presence at the Church on the night of the killings. Pls.' Req. for Admission ¶¶ 24, 27, 34-35.

Additionally, Plaintiffs have presented unrefuted record evidence from journalists who covered the First Civil War and official evaluations from the U.N., and U.S. diplomatic and intelligence sources finding AFL forces responsible for the attack at the Lutheran Church. *See, e.g.*, Jett Rpt. 38-29; Blunt Decl. ¶ 25; Huband Decl. ¶ 20; Robert Decl. ¶ 14.

For each of these reasons, Defendant has failed to present a material issue of fact precluding summary judgment.

**C. Defendant's Substantive Liability Under the TVPA**

Plaintiffs have established Defendant's liability under the Torture Victim Protection Act, 28 U.S.C. § 1350 note, for the acts of extrajudicial killing of Plaintiffs' decedents, attempted extrajudicial killings, and torture. These are acts for which the TVPA creates an "unambiguous and modern basis" for liability. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 728 (2004) (citing H.R. Rep. No. 102-367, at 3 (1991)). Plaintiffs have also established that Defendant acted under color of law while engaging in these acts. This section will first address Defendant's status as a state actor before turning to the individual acts he committed under the TVPA.

28

*1.  Defendant Acted Under Color of Law*

A defendant must have acted "under actual or apparent authority, or color of law" to be liable under the TVPA. 28 U.S.C. § 1350 note § 2(a). Meeting this definition requires establishing "some governmental involvement in the torture or killing," or that the individual "act[ed] together with state officials or with significant state aid." *Chowdhury v. WorldTel Bangladesh Holding, Ltd.*, 746 F.3d 42, 53 (2d Cir. 2014); *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995) (quoting H.R. Rep. No. 102-367 at 5 (1991)).

Plaintiffs have demonstrated state involvement in the Massacre. At the time of the killings in July 1990, the area around the church was under the AFL's control. There are witness accounts that Defendant and other SATU and AFL soldiers performed reconnaissance and intimidation activities at the Church before the killings. *Supra* Section III.D. Uniformed SATU officers were also seen at the site of the Massacre. *Supra* Section III.E. The observation of "uniformed members" of a sovereign state's security forces has been found to meet the TVPA requirement of state action. *Chavez v. Carranza*, 413 F. Supp. 2d 891, 901 (W.D. Tenn. 2005). Moreover, Defendant himself was part of these missions, was present at the Massacre, and gave the order to end the killing. *Supra* Section III.E. This degree of state action is all that is necessary to prove acts were committed under color of law. *See Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1092 (N.D. Cal. 2008), *aff'd,* 621 F.3d 1116 (9th Cir. 2010) (ruling that plaintiffs alleging they were attacked by members of the Nigerian military did not need to prove the acts were "committed in accordance with official Nigerian policy," but rather that it was "committed by an official or under color of law.").

2. *Plaintiffs' Decedents were Subjected to Extrajudicial Killing Under the TVPA*

The deaths of Jane W and John X's decedents fall well within the bounds of an "extrajudicial killing" under the TVPA. The statute defines an "extrajudicial killing" as a "deliberated killing not authorized by a previous judgment . . . [of] a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C.§ 1350 note § 3(a). Courts have held that "summary executions" and "a course of indiscriminate brutality, known to result in deaths" can also be "extrajudicial killings" under the TVPA. *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 17 (D.D.C. 1998), *abrogated on other grounds as recognized in Christie v. Islamic Republic of Iran*, No. CV 19-1289 (BAH), 2020 WL 3606273, at *21 (D.D.C. July 2, 2020).

Plaintiffs have demonstrated Jane W and John X's decedents were part of the 600 refugees killed at the Lutheran Church. *Supra* Section III.E; Jett Rpt. 37. Jane W was at the back of the Church with her husband and two daughters when the killings began, while John X hid under dead bodies until the morning. Jane W Decl. ¶ 19; John X Decl. ¶ 26. Jane W was separated from her relatives and later discovered they were among the dead, while John X saw the bodies of his daughter, wife, and two brothers. Jane W Decl. ¶ 26; John X Decl. ¶ 31.

Additionally, the killings meet the definition of "deliberate" under the TVPA, as they were "undertaken with studied consideration and purpose." *Kafutwa v. Solic. Gen.*, No. CIV.A. 13-147, 2013 WL 193233, at *2 (E.D. Pa. Jan. 17, 2013). The purpose was to kill the people sheltering at the Lutheran Church. Plaintiffs establish deliberate intent through the pattern of attacks on other areas where ethnic Mano and Gio civilians sheltered in the weeks and months leading to the Church Massacre. *Supra* Sections III.C-E. Other evidence includes reconnaissance visits to the Church by soldiers—including Defendant—later implicated in the Massacre, and the

nature of Defendant's participation in the attack. He oversaw the events and only declared an end to the shooting when he understood the occupants of the Church to have been all killed. *Id.*

Lastly, these killings were not authorized through any kind of judicial judgment falling within the TVPA's exception. 28 U.S.C. § 1350 note § 3(a). Through admissions, Defendant has acknowledged that "no court authorized" the actions during the Massacre, and undisputed record evidence speaks to the lack of judicial process under Liberian law that could have authorized such killings. Pl.'s Req. for Admission ¶ 37; *see also* CC Rpt. 32-33 ("To my knowledge, there is no evidence that any of the individuals seeking shelter at St. Peter's Lutheran Church were tried, convicted of crimes, and duly sentenced to death, in accordance with the provisions of the Liberian Penal Code.").

For each of these reasons, Defendant is liable for extrajudicial killing under the TVPA.

### 3.  *Plaintiffs were Subjected to Attempted Extrajudicial Killing Under the TVPA*

For substantially similar reasons, Defendant is also liable for the attempted extrajudicial killings of Plaintiffs. Courts have interpreted the TVPA to allow liability for attempted extrajudicial killings, "even if no one died as a result of [the] attempt." *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (citing *Warfaa v. Ali*, 33 F. Supp. 3d 653, 666 (E.D. Va. 2014) *aff'd*, 811 F.3d 653 (4th Cir. 2016); *see also Doe v. Constant*, Case No. 08-4827-cv, 2006 WL 3490503 (S.D.N.Y. Oct. 24, 2006), *aff'd* 354 Fed. App'x 543 (2d Cir. 2009) (affirmed default judgment finding liability for attempted extrajudicial killing under the TVPA).

Third Circuit precedent requires a "substantial step toward commission of the crime that strongly corroborates the firmness of a defendant's criminal purpose" for attempt liability. *Martinez v. Att'y Gen.*, 906 F.3d 281, 284 (3d Cir. 2018) (citing *U.S. v. Cicco*, 10 F.3d 980, 985

(3d Cir. 1993)). Defendant not only intended to kill everyone at the Church but took substantial steps to do so. *See supra* Section V.C.2 (describing the "deliberate" nature of the killings).

Each of the Plaintiffs were sheltering at the Lutheran Church on the night of the Massacre and were among the people shot at by the soldiers Defendant commanded. *Supra* Section III.E. The four were only able to survive by hiding in the pulpit or lying lifeless among the corpses. *Id.* Therefore, each Plaintiff was a victim of an attack that constituted an attempt to kill them. *Gill*, 249 F. Supp. 3d at 99 (citing *Constant*, 2006 WL 3490503 at 9 n.3). This establishes liability for an attempted extrajudicial killing.

### 4. *Plaintiffs were Subjected to Torture Under the TVPA*

Plaintiffs have established Defendant's liability for torture under the TVPA. Under the Act, "torture" refers to (1) "any act, directed against an individual in the offender's custody or physical control"; (2) "by which severe pain or suffering . . . whether physical or mental"; (3) "is intentionally inflicted on that individual for such purposes as . . . punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." 28 U.S.C. §1350 note § 3(b).

At the time of the Massacre, Plaintiffs were within Defendant's custody or physical control. Sufficient control for TVPA purposes can include situations where an individual's freedom of movement is restrained by a concrete threat. *See, e.g.*, *Boniface v. Viliena*, 338 F. Supp. 3d 50, 69 (D. Mass. 2018) ("Furthermore, Plaintiffs describe how Defendant and his associates threatened [them] with imminent death, first by pointing a handgun directly at [a plaintiff's] ear, and then by shooting at [them]."); *Jaramillo v. Naranjo*, No. 10-21951-CIV, 2014 WL 4898210, at *14 (S.D. Fla. Sept. 30, 2014) (finding that a person standing over the

plaintiff with a gun constituted sufficient "physical control"). In this case, the Lutheran Church was surrounded by SATU soldiers firing at all angles, actively trying to kill everyone. *Supra* Section III.E; Jane W Decl. ¶ 20; John Y Decl. ¶ 22. Plaintiffs survived because they hid amongst corpses. John Z Decl. ¶ 15; Jane W Decl. ¶¶ 20-21; John X Decl. ¶¶ 26-29. This threat persisted until the soldiers stopped shooting and left the church. Plaintiffs describe staying hidden until the morning after, fearing the soldiers would return. John X Decl. ¶¶ 29-30; Jane W Decl. ¶ 21; John Y Decl. ¶ 25.

Plaintiffs have also suffered severe and lasting physical and psychological injuries from the incident. Such severe pain can result from shooting, beating, and other forms of physical pain. *See, e.g.*, *Boniface v. Viliena*, 338 F. Supp. 3d 50, 69 (D. Mass. 2018) (finding gunshot wounds leading to "painful, permanent injuries" to be sufficient pain); *Jara v. Nunez*, No. 613CV1426ORL37GJK, 2014 WL 12623015, at *3 (M.D. Fla. June 30, 2014) (same, where defendant "brutally beat" plaintiff). Severe mental pain or suffering under the Act is "mental harm" resulting from "the intentional infliction or threatened infliction of severe physical pain or suffering," the "threat of imminent death," or "the threat that another individual will imminently be subjected to death, severe physical pain or suffering." 28 U.S.C. §1350 note § 3(b)(2). Plaintiffs faced "threat of imminent death" as soon as the assault on the Lutheran Church began; they all hid for their lives, including under other dead bodies, fearing that they would be killed. *Supra* Section III.E.

Plaintiffs have specified serious, prolonged physical and mental harms as a result of the Massacre. John Y has pointed to a bullet wound, while John Z has severe headaches and pain in his shoulder and ear, where a soldier stepped on him. John Y Decl. ¶ 36; John Z Decl. ¶ 32. Plaintiffs have also specified psychological harm: John Y continues to replay images of the

atrocities and the carnage in his mind, including the sight of his murdered aunt and her unborn child. John Y Decl. ¶ 35. John X was unable to raise his daughter and watch her grow up, and lives with the "emptiness" caused by the brutal deaths of her, his wife and his brothers. John X Decl. ¶ 46. Jane W experiences "unimaginable" pain in her heart when thinking about her murdered husband and daughters, and has trouble sleeping. Jane W Decl. ¶ 32. John Z finds that he is unable to do anything else for the rest of the day when he is reminded of the events and thinks about the Massacre. John Z Decl. ¶ 32.

Defendant's intentional infliction of pain on Plaintiffs was done for the purpose of discrimination, intimidation, or punishment. This element is satisfied when victims are targeted based on their purported membership in an identifiable group. *See Lizarbe v. Hurtado*, No. 07-21783-CIV, 2007 WL 9702177, at *1 (S.D. Fla. Nov. 21, 2007) (finding torture where "ethnic, racist and cultural differences played a significant role in the mistreatment of the plaintiffs"); *Doe v. Qi*, 349 F. Supp. 2d 1258, 1319 (N.D. Cal. 2004) (finding the "requisite intent to intimidate, punish and discriminate" where victims were targeted "because of their support of the Falun Gong practice") (emphasis in original).

Plaintiffs were deliberately targeted for these killings because they, along with the others sheltering at the Lutheran Church, were predominantly of the Mano and Gio ethnic groups. Mot. Summ. J. 6-10, 12, 28-29. The AFL had conducted attacks based on mere suspicion of Mano or Gio ethnic identity throughout the First Civil War. Jett Rpt. 30 n.146. The Church Massacre "cemented the ethnic nature of the conflict" and made abundantly clear that Mano and Gio Liberians were seen as official enemies of the government. *Id.* at 39. This degree of targeting satisfies the prerequisites for torture under the TVPA.

**D.  Defendant's Substantive Liability Under the ATS**

Plaintiffs have also established Defendant's liability under the Alien Tort Statute, 28

U.S.C. § 1350.

The ATS provides a right of action "by an alien [noncitizen] for a tort only, committed in

violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Contemporary

ATS claims can invoke rights created under modern human rights treaties, and federal courts

have allowed ATS claims stemming from "a broad range of misconduct, including genocide, war

crimes, torture, and supporting terrorism." *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1019 (9th

Cir. 2014).

ATS claims based on contemporary international law are limited, however. Federal

courts "should not recognize private claims under federal common law for violations of any

international law norm with less definite content and acceptance among civilized nations than the

historical paradigms [piracy, violation of safe conducts, and interference with ambassadors]

familiar when § 1350 was enacted." *Id.* (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732

(2004)). Norms with this level of acceptance among nations—customary international law—can

be determined by "Look[ing] to the sources of law identified by the Statute of the International

Court of Justice . . . . [which] include international conventions, international customs, the

general principles of law recognized by civilized nations, judicial decisions, and the works of

scholars," as well as authorities like the Rome Statute of the International Criminal Court

("Rome Statute"). *Id.* at 1019-20 (citing *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 267

(2d Cir. 2007) (Katzmann, J., concurring)).

Plaintiffs allege Defendant's conduct constituted cruel, inhuman, or degrading treatment,

and met the elements for multiple war crimes, and crimes against humanity. These offenses are

all actionable violations of the ATS. *Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 256-57 (2d Cir. 2009) (finding "war crimes" and "crimes against humanity" actionable under the ATS); *Kadic v. Karadzic*, 70 F.3d 232, 240 n.3 (2d Cir. 1995) (citing Restatement (Third) of Foreign Relations Law § 702 (1987), which specifies "torture or other cruel, inhuman or degrading treatment" as a violation of international law).

Plaintiffs allege and have substantiated Defendant is liable for the following specific acts under the ATS: (1) cruel, inhuman, or degrading treatment, (2) war crimes, and (3) crimes against humanity.

Defendant is accused of the war crimes of (2.1) intentionally directing attacks against civilians and (2.2) intentionally directing attacks against a building dedicated to religion.

Defendant is accused of the crimes against humanity of (3.1) persecution and (3.2) extermination.

### 1. Defendant is Liable for Cruel, Inhuman, or Degrading Treatment

Cruel, inhuman or degrading treatment constitutes acts that "inflict mental or physical suffering, anguish, humiliation, fear and debasement, which do not rise to the level of torture or do not have the same purposes as torture." *Chiminya Tachiona v. Mugabe*, 216 F. Supp. 2d 262, 281 (S.D.N.Y. 2002). The dividing line between the two violations "derives principally from a difference in the intensity of the suffering inflicted." *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d 228, 254 (S.D.N.Y. 2009) (citing Restatement (Third) of Foreign Relations Law § 702 Reporter's Note 5 (1987)).

The elements of cruel, inhuman or degrading treatment under the ATS mirror those for torture under the TVPA; the only difference is the amount of suffering inflicted. Therefore, because Defendant is liable for torture under the TVPA and Plaintiffs can show the requisite

amount of suffering inflicted, he is also liable for this crime under the ATS. *See supra* Section V.C.4.

### 2. *Defendant is Liable for War Crimes*

Plaintiffs have also demonstrated Defendant's liability for two war crimes under the ATS: (1) intentionally directing attacks against civilians, and (2) intentionally attacking a building dedicated to religion or a charitable purpose. War crimes are major violations of the law of armed conflict. These provisions are found in customary international law and codified in the four Geneva Convention treaties—ratified by the U.S. and Liberia—and their Additional Protocols.[16] ICRC Treaty Database, Geneva Conventions (with Protocols). It is well established that these treaties can form the basis of war crimes actionable under the ATS. *See Kadic*, 70 F.3d at 242-43 (specifying the Geneva Conventions, including Common Article 3, to determine actionable war crimes under the ATS); *In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 588 (E.D. Va. 2009) ("Congress, by ratifying the Geneva Conventions and by enacting the War Crimes Act, has defined the international law norm governing war crimes.").

Any war crime must be committed "in the course of an armed conflict." *Kadic*, 70 F.3d at 244. The attack on the Lutheran Church was indisputably part of the hostilities during the First Civil War, specifically between governmental AFL forces and non-governmental NPFL and INPFL rebel groups. *Supra* Section III.A. The Civil War therefore constitutes a non-international armed conflict covered by Common Article 3 of the Geneva Conventions. *Hamdan v. Rumsfeld*,

---

[16] The United States has ratified Protocol III of the Geneva Convention, but has only signed Protocols I and II. ICRC Treaty Database, United States of America. Liberia has ratified all of the additional protocols. ICRC Treaty Database, Geneva Conventions (with Protocols).

548 U.S. 557, 630-31 (2006) (citing Int'l Comm. of Red Cross, Commentary on the Additional Protocols to the Geneva Conventions of 12 August 1949, p. 1351 (1987)).

### a. Intentionally Directing Attacks Against Civilians

Defendant is liable for the war crime of "[i]ntentionally directing attacks against the civilian population . . . or against individual civilians not taking direct part in hostilities." Rome Statute, Art. 8(2)(e)(i), July 17, 1998. This crime consists of three elements: (1) the perpetrator directed the attack; (2) the victims were civilians; and (3) the perpetrator intended to attack civilians taking no direct part in the hostilities. International Criminal Court, Elements of Crimes ("ICC Elements of Crimes"), Art. 8(2)(b)(i); *see also In re XE Services Alien Tort Litig.*, 665 F. Supp. 2d at 588 (requiring the conduct be directed "upon innocent civilians"); *Presbyterian Church of Sudan v. Talisman*, 453 F. Supp. 2d 633, 671, 677 (S.D.N.Y. 2006) (requiring the alleged conduct "targeted civilians or was undertaken to displace citizens").

Defendant directed the attack against those sheltering at the Lutheran Church. *Supra* Section III.E. He performed reconnaissance before the Massacre and was at the scene of the attack, directing soldiers in the killing. *Id.* His conduct therefore constitutes "direction" of the attack for ATS liability purposes.

Secondly, there is no dispute that the victims of the Lutheran Church Massacre were unarmed civilians. Stip. Facts ¶ 9; Jett Rpt. 39-40. The Red Cross prohibited weapons from the Church, and multiple witnesses confirmed the occupants of the compound were refugees. Jane W Decl. ¶ 9; John X Decl. ¶ 17; Blunt Decl. ¶ 22; William Y Decl. ¶¶ 8, 11; William X Decl. ¶ 12; William W Decl. ¶ 12.

Thirdly, Defendant's intent to attack civilians can be inferred from his knowledge of noncombatants sheltering at the Lutheran Church. Thomas and the soldiers he commanded

visited the Church before the attack and spoke with the civilians there. Jane W Decl. ¶¶ 13-17. On at least one visit, SATU forces were explicitly told the occupants of the Church were internally displaced persons. John X Decl. ¶ 2. Other documented visits by AFL and SATU troops to the Church before the Massacre would have cemented this impression. *See Id.* at ¶ 22; Jett Rpt. 35-37; Blunt Decl. ¶ 20; Huband Decl. ¶ 15; William X Decl. ¶¶ 5-14; John Y Decl. ¶ 7; William W Decl. ¶¶ 7, 9, 13. Defendant, present at the Church during the Massacre, would also have known the non-combatant nature of the victims through the fact that no one shot back during the assault. *Supra* Section III.E.

### b.   *Intentionally Directing Attacks Against Buildings Dedicated to Religion*

Defendant is liable for the war crime of "[i]ntentionally directing attacks against buildings dedicated to religion, education, art, science or charitable purposes." Rome Statute, Art. 8(2)(e)(iv), July 17, 1998. This crime has three key elements: a perpetrator must (1) direct an attack, on (2) "one or more buildings dedicated to religion, education, art, science or charitable purposes . . . which were not military objectives," and the perpetrator must (3) intend "such building or buildings . . . to be the object of the attack." ICC Elements of Crimes, Art. 8(2)(e)(iv).

Defendant perpetrated the attack, establishing the first element. *See supra* Section III.E and Section V.D.1. For the second element, the Church was used for religious and charitable purposes: services continued even after the Red Cross had converted the compound into a shelter for internally displaced Liberians. Jett Rpt. 35-36; Voros Decl. ¶ 15; Blunt Decl. ¶ 20; William X Decl. ¶¶ 6, 8, 9; William W Decl. ¶¶ 7, 9. Plaintiffs considered the Church a safe place *because* they assumed AFL forces would not attack a place of worship. *See* Jane W Decl. ¶¶ 9, 17 (describing her husband believing they would not be killed because "the Church was a place of

worship" and "we were in God's house"). The Church was also indisputably not a military target; the building was flanked by Red Cross and U.N. flags, and the screening table had a Red Cross insignia. Mot. Summ. J. 11; *see also* Blunt Ex. F 4 (observing in a post-Massacre report for the BBC that the refugees "had no real protection . . . [except for] the moral force of the clergy and the Red Cross flag."). Military targets are limited to those that "by their nature, location, purpose or use make an effective contribution to military action and whose total or partial destruction, capture or neutralization, in the circumstances ruling at the time, offers a definite military advantage." Additional Protocol I, Art. 52(2). None of these elements apply to the Lutheran Church; it was in an area of Monrovia already under AFL control, negating a military advantage. Mot. Summ. J. 10. The nature, use, and purpose of the facility were solely civilian in nature. *Id.* at 10-11.

As for the third element, Defendant knew the Church was not a legitimate military target precisely because he "intentionally direct[ed] attacks against civilians." *See supra* Section V.D.2.a. Defendant's previous visits to the church would have made obvious that it was being used for charitable and religious purposes. *Id.* The Red Cross' involvement with the church was "clear to see for passerby" and AFL soldiers—including Defendant himself—were specifically trained as to the importance of respecting the Red Cross symbol. *See* Jett Rpt. 36; William Z Decl. ¶ 19; William Y Decl. ¶ 8.

### 3. *Defendant is Liable for Crimes Against Humanity*

Defendant is also liable for crimes against humanity under the ATS. These crimes are inhumane acts that include "murder, enslavement, deportation or forcible transfer, [or] torture" and are "committed as part of a widespread [or] systematic attack directed against a civilian population." *Talisman Energy*, 582 F.3d at 257; ICC Elements of Crimes, Art. 7 ("These

elements clarify the requisite participation in and knowledge of a widespread or systematic attack against a civilian population."). Persecution and extermination, the crimes against humanity Plaintiffs seek liability under, are actionable under the ATS. *See, e.g.*, *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 286-287, n.1 (2d Cir. 2007) (Hall, J., concurring) (acknowledging extermination as a crime against humanity cognizable under the ATS); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 316-17 (D. Mass. 2013) ("persecution that rises to the level of a crime against humanity has repeatedly been held to be actionable under the ATS").

All crimes against humanity require Plaintiffs to demonstrate the crime was (1) part of a widespread or systematic attack against civilians, and (2) the defendant "intended to further such an attack." ICC Elements of Crimes, Art. 7. These elements exist here.

The killings at the Lutheran Church were part of a widespread, systematic, and ethnically motivated attack against Mano and Gio civilians. In determining whether an attack is "widespread" for the purposes of a crime against humanity, courts look to the "large-scale" nature of the attack and the number of targeted persons. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 481 (S.D.N.Y. 2005). "Systematic" refers to "the organized nature of the acts of violence and the improbability of their random occurrence." *Id*. (citing *Prosecutor v. Kordic*, No. IT-95-14/2-A, ¶ 94 (App. Chamber, Int'l Crim. Trib. for the Former Yugoslavia, Dec. 17, 2004)); *see also Prosecutor v. Blaškič*, No. IT-95-14-T, ¶ 206 (Trial Chamber, ICTY, Mar. 3, 2000) ("A crime may be widespread or committed on a large-scale by 'the cumulative effect of a series of inhumane acts or the singular effect of an inhumane act of extraordinary magnitude'").

The Church Massacre meets these criteria. It was part of a widespread, large scale assault led by AFL forces on Mano and Gio civilians that lasted for months. *See supra* Sections III.C-D. The ethnic killings were part and parcel of the escalation of the First Civil War in the summer of 1990. *See, e.g.*, Jett Rpt. 29 ("As the front line drew nearer to the capital, the frequency of arbitrary arrest and execution of perceived enemies, based primarily on ethnicity, increased. No Mano or Gio was safe: 'Liberians of all ages were killed on the basis of ethnic identity.'"). The Lutheran Church Massacre was the crescendo to a series of killings that included attacks on the UNDP compound and the JFK Hospital. *See supra* Section III.C.

The killings were also systematic, in that they were a part of a series of "organized" violent acts that evinced the "improbability of their random occurrence." *Prosecutor v. Kordić*, Case No. IT-95-14/2-A, ¶ 94 (App. Chamber, Int'l Crim. Trib. for the Former Yugoslavia, Dec. 17, 2004). The mass killings of Mano and Gio civilians during the First Civil War were "part of an overall policy or a consistent pattern of inhumanity"—as opposed to "isolated or sporadic acts of cruelty or wickedness." *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1156 (E.D. Cal. 2004). Based on their perceived support of rebel forces, Mano and Gio civilians were regularly killed, sometimes summarily executed. *See supra* Section III.C. The Lutheran Church Massacre was part of this campaign because it was conducted in the same way: the same ethnic groups targeted—some of whom were survivors of the previous attacks—the same soldiers involved, and overlapping perpetrators, including Defendant. *See supra* Sections III.C-D.

Defendant also met the requisite mental element for crimes against humanity: he knew the attack would be against civilians, and "intended to further" it when he directed the Lutheran Church Massacre. ICC Elements of Crimes, Art. 7. Defendant's knowledge and intent can be shown through (1) his involvement in prior attacks on Mano and Gio AFL soldiers during the

First Civil War; (2) his position as a colonel in the AFL and commander of SATU; and (3) his previous visits to the Lutheran Church, which made clear he knew the location was not a military target. *See supra* Section III.C, especially page 7, n.8; Sections III.D-E. The actions of Thomas "were consistent with the pattern and practice of abuses" against Mano and Gio Liberians, and "demonstrate that he was well aware of being part of a campaign of ethnic cleansing that was both widespread and systematic." *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1353-54 (N.D. Ga. 2002); *see also Saravia*, 348 F. Supp. 2d at 1157 (finding knowledge requirement met where defendant knew he was part of a death squad assassinating an important civilian figure, on grounds that the assassination took place within the context of widespread and systematic state-sponsored attacks against civilians during the time period).

> c.  *Persecution*

Plaintiffs have demonstrated Defendant's liability for the crime against humanity of persecution under the ATS. This crime requires: (1) "denial of fundamental rights" and (2) "the intentional targeting of an identifiable group." *Lively*, 960 F. Supp. 2d at 317; *see also* ICC Elements of Crimes, Art. 7(1)(h).

The Massacre deprived Plaintiffs and their decedents of "the equal enjoyment of [their] basic rights[,]" including the right to life, right to be free from torture, and right to be free from cruel, inhuman, and degrading treatment. *See Lively*, 960 F. Supp. 2d at 317 (noting that courts look to the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights to determine fundamental rights) (citing *Prosecutor v. Kupreškić,* Judgment, IT-95-16-T, ¶ 621 (Jan. 14, 2000)); Prosecutor v. Kordić, Appeals Judgment, Case No. IT-95-14/2-A, ¶ 106 (Int'l Crim. Trib. for the Former Yugoslavia, Dec. 17, 2004) ("the inherent right to life and to be free from cruel, inhuman or degrading treatment or punishment is recognised in

customary international law"). These violations have been substantiated through the factual record Plaintiffs developed of the Massacre. *Supra* Sections III.C-F.

The intentional targeting of these civilians because of their purported ethnic identity is also established, satisfying the second element of the crime of persecution. The needed intent "may be inferred from an accused's knowing participation in a system or enterprise that discriminated on political, racial or religious grounds" including "knowledge of . . . [a] common plan coupled with his willing participation in it." *Prosecutor v. Popović*, Case No. IT-05-88-A, Appeals Judgment, ¶¶ 711-712 (Int'l Crim. Trib. for the Former Yugoslavia, Jan. 30, 2015). Defendant's "knowing participation" in a system that discriminated against Mano and Gio ethnic Liberians has been well established. *Supra* Sections III.B-C. Defendant directly perpetrated the offense, through his presence and command of the Massacre. *Supra* Section III.E. The presence of a senior officer at the site of an ethnically motivated mass killing has provided ample basis for the crime of persecution in the context of other internal conflicts. *See, e.g.*, *Popović*, Appeals Judgment ¶ 712 (finding the most senior officer's presence at killings of "able-bodied Bosnian Muslim males in and around Srebrenica" sufficient to infer discriminatory intent).

### d.   Extermination

Plaintiffs have demonstrated Defendant's liability for the crime against humanity of extermination under the ATS. This crime requires that (1) one or more persons were killed; (2) as part of "a mass killing of members of a civilian population"; and (3) "[t]he perpetrator knew that the conduct was part of or intended the conduct to be part of a widespread or systematic attack directed against a civilian population." ICC Elements of Crimes, Art. 7(1)(b).

It has been established that Plaintiffs' decedents and hundreds of others were killed in the Lutheran Church Massacre, satisfying element one. *Supra* Section III.E.

The Massacre was also part of a large-scale killing campaign of purported Mano and Gio civilians. The "large scale" nature of an act of extermination is determined on a case by case basis, considering factors like "(i) the time and place of the killings, (ii) the selection of the victims and the manner in which they were targeted, [and] (iii) whether the killings were aimed at the collective group rather than victims in their individual capacity." *Prosecutor v. Stanišić & Župljanin*, Case No. IT-08-91-A, Appeals Judgment, ¶ 1022 (Int'l Crim. Trib. for the Former Yugoslavia June 30, 2016). Here, Plaintiffs' decedents were among 600 people killed during the Lutheran Church Massacre, a mass killing that was part of a systematic assault on civilians of Mano and Gio ethnicity. *See supra* Section III.C; Jett Ex. ZZZ at 219 (listing ethnic massacres during the First Civil War, as detailed by the Liberian TRC). Therefore, the "massiveness" of the killings has been substantiated. *See Prosecutor v. Lukic*, Case No. IT-98-32/1-A, Appeals Judgment, ¶¶ 536-538 (Int'l Crim. Trib. for the Former Yugoslavia Dec. 4, 2012) (clarifying that it is the element of "massiveness" that distinguishes extermination as a crime from murder, and that the collective of victims need not share any common characteristics).

Furthermore, Defendant's knowledge of the Massacre being part of a widespread or systematic attack has been established. *See supra* Section V.D.3 (particularly discussion of the "systematic" element required to be liable for any crime against humanity).

### E.  Defendant is Directly Liable Under Both Statutes

Plaintiffs have established Defendant is primarily liable for directing or ordering the Massacre, through circumstantial evidence. Based on his command of the SATU, Defendant is also subject to command responsibility liability.

Claims based on primary and secondary theories of liability are recognized under the ATS and TVPA. *See, e.g.*, TVPA, S. Rep. No. 102-249, at 8-9 (1991) (explaining that "[a] higher

official need not have personally performed or ordered the abuses in order to be held liable");

*Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) ("the TVPA contemplates liability

against officers who do not personally execute the torture or extrajudicial killing");

*Hilao v. Estate of Marcos*, 103 F.3d 767, 777 (9th Cir. 1996) (recognizing command

responsibility under the TVPA and ATS, and citing the TVPA Senate Report in support).

Defendant is directly liable for wrongful acts during the Massacre; as discussed *supra*

Sections V.C-D, he intentionally directed an attack on a building dedicated to religion,

personally directed an attack on civilians, and committed the crime against humanity of

persecution.

*1.  Defendant Directed or Ordered the Massacre*

Liability for directing or ordering requires (1) a superior-subordinate relationship, under

which (2) the defendant issues an order, (3) with knowledge of the substantial likelihood that

human rights abuses will follow. Trial Transcript (Jury Instructions) at 211, *Warfaa v. Ali*, 33 F.

Supp. 3d 653 (E.D. Va. May 19, 2019) (No. 05-cv-701). These elements are satisfied.

In showing a superior-subordinate relationship, Plaintiffs must show by a preponderance

of evidence that Defendant was in a position of authority that would compel one to commit

human rights abuses at their order. *Id.* at 212; *see also Abebe-Jiri v. Negewo*, No. 1:90-CV-2010-

GET, 1993 WL 814304, at *4 (N.D. Ga. Aug. 20, 1993), *aff'd sub nom. Abebe-Jira v. Negewo*,

72 F.3d 844 (11th Cir. 1996) ("Defendant is responsible under international law for his own acts,

for acts which he directed, ordered, aided, abetted or participated in, and for acts committed by

forces under his command which he authorized."). Determining this authority can be done by

looking to the circumstances of the individual or individuals receiving direction. Trial Transcript

(Jury Instructions) at 212, *Warfaa v. Ali*, 33 F. Supp. 3d 653 (No. 05-cv-701); *See Gacumbitsi v.*

*Prosecutor*, Case No. ICTR-2001-64-A, Appeals Chamber Judgment ¶ 182 (July 7, 2006) ("Ordering . . . requires merely authority to order, a more subjective criterion that depends on the circumstances and the perceptions of the listener.").

In this case, Defendant has acknowledged that he had a superior-subordinate relationship with the soldiers of the SATU, who were under his command. Pl.'s Req. for Admission ¶¶ 3, 5. *See, e.g.*, *Prosecutor v. Semanza*, Case No. ICTR-97-20-A, Appeals Chamber Judgment, ¶¶ 361-63 (May 20, 2005) (finding on the facts of the case "no reasonable trier of fact could hold otherwise than that the attackers to whom the Appellant gave directions regarded him as speaking with authority"). SATU was a military unit that was indisputably under Defendant's command; only President Doe himself would have been able to supersede Thomas' orders. *See supra* Section III.B (stating Defendant "exercised control over the SATU, and members of the unit only took orders from Thomas or their sub-unit commander," and further noting that SATU was answerable only to Doe).

Defendant also gave the order to attack the Lutheran Church. Such an order does not need to be written or explicit but can be inferred through circumstantial evidence. Trial Transcript (Jury Instructions) at 213, *Warfaa*, 33 F. Supp. 3d 653 (No. 05-cv-701); *Prosecutor v. Galić*, Appeals Chamber Judgement, ICTY-98-29-A (Nov. 30, 2006) ¶ 239 ("the Prosecution's burden of proof was established by circumstantial evidence of [defendant's] knowledge of the crimes committed by his forces, the high degree of discipline he had over his subordinates, and his failure to act upon his knowledge of the commission of crimes."). With regards to the Lutheran Church Massacre, the ordering can be inferred through the sequence of events: soldiers arrived as a group and began the attack only after they received the signal of a pistol being shot in the air, and continued until Defendant specifically stated "everyone is dead." *Supra* Section III.E.

These facts, along with Defendant's presence as the highest-ranking member of the AFL at the Church that evening, points to him ordering and directing the Massacre. *Id.*

Lastly, Defendant intended the result of human rights abuses from his orders or directions. This is established because, given the circumstances, Defendant knew of "the substantial likelihood that a crime will be committed in the execution of [their] order." Trial Transcript (Jury Instructions) at 211, *Warfaa*, 33 F. Supp. 3d 653 (No. 05-cv-701); *Kordić*, Appeals Chamber Judgment ¶¶ 29-30. Additionally, he knew his soldiers were subject to punishment for disobeying his orders, and that his forces had committed previous mass killings. Mot. Summ. J. 5-7.

### 2. *Defendant is Liable on the Basis of Command Responsibility*

The evidence presented by Plaintiffs also proves Defendant's liability under a theory of command responsibility. This theory requires (1) a "superior-subordinate relationship between the defendant/military commander and the person or persons who committed human rights abuses; (2) the defendant/military commander knew, or should have known, in light of the circumstances at the time, that subordinates had committed, were committing, or were about to commit human rights abuses; and (3) the defendant/military commander failed to take all necessary and reasonable measures to prevent rights abuses and punish human rights abusers." *Yousuf v. Samantar*, No. 1:04CV1360 LMB/JFA, 2012 WL 3730617, at *11 (E.D. Va. Aug. 28, 2012) (citing *Chavez v. Carranza*, 559 F.3d 486, 499 (6th Cir. 2009)); *Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir. 2002) (adopting the same elements).

The superior-subordinate relationship exists under a command responsibility theory for the same reasons it exists for the purposes of direct liability. *Supra* Section V.E.1. Defendant's control over his soldiers was both legal and "effective," in that he had the practical ability to

direct their actions. *Doe v. Qi*, 349 F. Supp. 2d 1258, 1332 (N.D. Cal. 2004) (Finding a superior-subordinate relationship where defendant "played a major policy-making and supervisory role in the policies and practices that were carried out").

Secondly, Plaintiffs have established Defendant "knew, or should have known, in light of the circumstances at the time, that subordinates had committed, were committing, or were about to commit human rights abuses." *Yousuf*, 2012 WL 3730617, at *11. Defendant had committed previous killings, and oversaw the Lutheran Church Massacre, where soldiers were directed to deliberately kill civilians. *Supra* Sections III.D-E. These facts have supported liability under the command responsibility theory in other cases. *See Xuncax v. Gramajo*, 886 F. Supp. 162, 172 (D. Mass. 1995) ("plaintiffs have convincingly demonstrated that, at a minimum, [defendant] was aware of and supported widespread acts of brutality committed by personnel under his command").

Lastly, Defendant did not take any measures to prevent human rights abuses and did not punish his subordinates after the Massacre. This constitutes a violation of the ongoing obligation of military commanders to investigate and punish perpetrators of war crimes. *See* International Committee of the Red Cross, Study on Customary International Humanitarian Law, Rule 153 (iv) (2005), https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule153 . Failure to punish can be established by showing the "military commander or person failed to take all necessary and reasonable measures to . . . submit [war crimes] to the competent authorities for investigation and prosecution. *Ford*, 289 F.3d at 1287 n.3, 1293 (11th Cir. 2002) (citing Rome Statute, Art. 28(a), July 17, 1998). In this case, there is no dispute that Defendant failed to prevent human rights abuses or punish subordinates when abuses happened. Despite the

existence of a court martial system, Defendant never punished any members of his unit through that mechanism for the acts of the Massacre. William Z Decl. ¶ 38.

For these reasons, Defendant is liable under a command responsibility theory.

### F. The Additional Protective Order is Granted

Plaintiffs have also demonstrated the necessity of a Supplemental Protective Order in this case. In their motion, which Defendant did not file an opposition to, Plaintiffs detailed the intimidation risks caused by Defendant's return to Liberia. Thomas has leveraged his contacts in the country's security forces—such as ex-SATU members—to harass individuals suspected of being associated with this action, and similar acts of intimidation have been observed against witnesses in other human rights accountability cases in Liberia. *See supra* Section II; Mot. Suppl. Prot. Or. Section II.C ("witnesses and staff supporting recent U.S., Swiss, and Belgian cases against alleged perpetrators of Civil Wars-era human rights violations have faced reprisals, including by the defendants in these cases, their allies, and former co-combatants"). Plaintiffs have already established the ambient threat of retaliation for speaking out against human rights abuses during the First Civil War; those fears justify the very existence of this legal action. *Supra* Section V.A.1.

As a result, this Court will grant the new Protective Order. The four Liberian fact witnesses identified in Plaintiffs' second supplemental disclosures to Defendant dated February 10, 2021 may proceed anonymously, and Plaintiffs may file the Liberian Witnesses' declarations under pseudonyms and with redactions. Additionally, the Liberian expert disclosed by Plaintiffs to Defendant on February 16, 2021 and Exhibit A of the report, may be filed on the public docket with redactions and under seal.

**G. An Evaluation of Damages Will be Conducted Separately**

As a final matter, this Court will defer the determination of damages to a later stage of these proceedings, to be conducted by Magistrate Judge Lynne A. Sitarski.

**VI.   CONCLUSION**

For the foregoing reasons, summary judgment for Plaintiffs is granted. An appropriate order follows. The determination of damages is referred to Magistrate Judge Lynne A. Sitarski.